# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:24-cv-01869-SMB

GovernmentGPT Incorporated et al v. Axon Enterprise
Incorporated et al
Assigned to: Judge Susan M Brnovich
Cause: 15:1125 Trademark Infringement (Lanham Act)

Date Filed: 07/29/2024
Jury Demand: Plaintiff
Nature of Suit: 840 Property Rights:
Trademark
Jurisdiction: Federal Question

**Plaintiff**

**GovernmentGPT Incorporated**                  represented by  **Raj Abhyanker**
Raj Abhyanker PC
1580 W El Camino Real, Ste. 10
Mountain View, CA 94040
650-390-6461
Fax: 650-989-2131
Email: raj@legalforcelaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Spencer Robert Keller**
LegalForce RAPC Worldwide PC
446 E Southern Ave.
Tempe, AZ 85282
602-885-6174
Email: spencer@trademarkia.com
*TERMINATED: 09/19/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Raj Abhyanker**
*Individually and on Behalf of All Other*
*Taxpayers Similarly Situated*
*TERMINATED: 09/22/2024*

represented by  **Raj Abhyanker**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Spencer Robert Keller**
(See above for address)
*TERMINATED: 09/19/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Unknown Parties**
*named as: Municipality and Police*
*Departments Does 1-500*
*TERMINATED: 09/22/2024*

represented by **Raj Abhyanker**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Spencer Robert Keller**
(See above for address)
*TERMINATED: 09/19/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Axon Enterprise Incorporated**
*formerly doing business as*
Taser International Incorporated

represented by **Charles W Steese**
Papetti Samuels Weiss McKirgan LLP
16430 N Scottsdale Rd., Ste. 290
Scottsdale, AZ 85254
480-800-3537
Email: csteese@pswmlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gayathiri Shanmuganatha**
Axon Enterprise Incorporated
17800 N 85th St.
Scottsdale, AZ 85255-9603
602-830-0390
Email: gshanmuganatha@axon.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Pamela Beth Petersen**
Axon Enterprise Incorporated
17800 N 85th St.
Scottsdale, AZ 85255-9603
623-326-6016
Fax: 480-905-2027
Email: ppetersen@axon.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall Papetti**
Papetti Samuels Weiss McKirgan LLP
16430 N Scottsdale Rd., Ste. 290
Scottsdale, AZ 85254
480-800-3535
Email: rpapetti@pswmlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Microsoft Corporation**

represented by **Jessica Lee Everett-Garcia**
Perkins Coie LLP - Phoenix, AZ
2525 E Camelback Rd., Ste. 500
Phoenix, AZ 85016
602-351-8000
Fax: 602-648-7027
Email: JEverettGarcia@perkinscoie.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Chapman**
Dechert LLP - Philadelphia, PA
2929 Arch St, 26th Fl.
Philadelphia, PA 19104
215-994-2060
Email: julia.chapman@dechert.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell Cohen**
Dechert LLP - San Francisco, CA
45 Fremont St., 26th Fl.
San Francisco, CA 94105
415-262-4500
Email: russ.cohen@dechert.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Romine**
Perkins Coie LLP - Phoenix, AZ
2525 E Camelback Rd., Ste. 500
Phoenix, AZ 85016
602-351-8071
Email: vromine@perkinscoie.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Unknown Parties**
*named as: Does 1-50*
*TERMINATED: 09/22/2024*

**Defendant**

**Safariland LLC**

represented by **Ian Matthew Fischer**
Jaburg Wilk - Phoenix, AZ
1850 N Central Ave., Ste. 1200
Phoenix, AZ 85004
602-248-1065
Email: imf@jaburgwilk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Granger Kress**
Baker & Botts LLP - Washington DC
700 K St. NW
Washington, DC 20001
202-639-7884
Fax: 202-639-1159
Email: james.kress@bakerbotts.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/29/2024 | 1 | COMPLAINT. Filing fee received: $405.00, receipt number BAZDC-23297506 filed by GovernmentGPT Incorporated, Raj Abhyanker, Unknown Parties. (submitted by Raj Abhyanker) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Civil Cover Sheet)(REK) (Entered: 07/30/2024) |
| 07/29/2024 | 2 | Emergency MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (submitted by Raj Abhyanker) (REK) (Entered: 07/30/2024) |
| 07/29/2024 | 3 | SUMMONS Submitted by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (submitted by Raj Abhyanker) (Attachments: # 1 Summons)(REK) (Entered: 07/30/2024) |
| 07/29/2024 | 4 | Filing fee paid, receipt number BAZDC-23297506. This case has been assigned to the Honorable Susan M Brnovich. All future pleadings or documents should bear the correct case number: CV-24-01869-PHX-SMB. Notice of Availability of Magistrate Judge to Exercise Jurisdiction form attached. (REK) (Entered: 07/30/2024) |
| 07/30/2024 | 5 | Summons Issued as to Axon Enterprises Incorporated, Microsoft Corporation. (Attachments: # 1 Summons)(REK). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 07/30/2024) |
| 07/30/2024 | 6 | MINUTE ORDER: Request for Copyright, Trademark, or Patent Information. This case has been designated as a copyright, trademark, or patent case. The Clerk's Office is required to provide information to the Patent and Trademark Office and/or Copyright Office regarding this case. Attached to this docket entry are the required form(s) that must be completed. Plaintiff shall complete the form that is applicable to this particular case. In some cases, you may need to complete both forms.<br><br>Within seven (7) days, Plaintiff must submit the required form(s) to the Clerk's Office. Please complete the form and file it with the Court using the specific event: ***Notice of Filing - Copyright, Trademark or Patent Information***, found under the Other Filings header. Please DO NOT mail the form directly to the Patent or Copyright Office. The Clerk's Office will submit the form. If neither form is required for this case, please file a notice indicating the reason the form is not necessary and use the event listed above. This form must be updated if additional patents, copyrights, or trademarks are alleged in a responsive pleading. (REK) (Entered: 07/30/2024) |
| 07/30/2024 | 7 | NOTICE TO FILER OF DEFICIENCY re: 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events filed by GovernmentGPT Incorporated, Unknown Parties, Raj Abhyanker, 1 Complaint filed by GovernmentGPT Incorporated, Unknown Parties, Raj Abhyanker. Document not in compliance with LRCiv 7.1(a)(3) - |

| | | Party names must be capitalized using proper upper and lower case type. ***FOLLOW-UP ACTION REQUIRED:*** Attorney must update PACER account to match law firm information on pleading: **Spencer Robert Keller**. Law firm name listed on pleading: *LegalForce RAPC Worldwide PC*. Law firm in CM-ECF Account: *Trademarkia*. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (REK) (Entered: 07/30/2024) |
|---|---|---|
| 07/30/2024 | 8 | PRELIMINARY ORDER this matter having recently come before this Court, the parties are advised of the following preliminary policies and procedures that will govern these proceedings and are ordered as follows. Plaintiff(s) must promptly serve a copy of this Order on Defendant(s) and file notice of service with the Clerk of Court. See attached Order for complete details. Signed by Judge Susan M. Brnovich on 7/30/2024. (ESG) (Entered: 07/30/2024) |
| 07/30/2024 | 9 | ORDER directing the Clerk of Court to terminate any or all Defendants in this matter, without further notice, that have not been served within the time required by Fed. R. Civ. P. 4(m) on **October 28, 2024.** Signed by Judge Susan M. Brnovich on 7/30/2024. (ESG) (Entered: 07/30/2024) |
| 07/30/2024 | 10 | NOTICE TO PARTY RE: DISCLOSURE STATEMENT: Pursuant to FRCiv 7.1 and LRCiv 7.1.1 the attached Disclosure Statement form must be filed by all nongovernmental corporate parties with their first appearance. A supplemental statement must be filed upon any change in the information. In addition, if not already filed, the Disclosure Statement should be filed within 14 days. Disclosure Statement Deadline set as to GovernmentGPT Incorporated. (REK) (Entered: 07/30/2024) |
| 07/30/2024 | | Remark: Pro hac vice motion(s) granted for Raj Abhyanker on behalf of Plaintiffs Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 07/30/2024) |
| 07/30/2024 | 11 | *NOTICE of Filing - AO 120 Report on the Filing or Determination of an Action or Appeal Regarding a Patent or Trademark filed by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) *Modified to correct text on 7/31/2024 (REK). (Entered: 07/30/2024) |
| 07/30/2024 | 12 | Corporate Disclosure Statement by GovernmentGPT Incorporated. (Abhyanker, Raj) (Entered: 07/30/2024) |
| 07/30/2024 | 13 | NOTICE of Errata re: 1 Complaint, 7 Notice of Deficiency (Text Only),,, *Corection of Party names must be capitalized using proper upper and lower case type* by Plaintiffs Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 07/30/2024) |
| 07/30/2024 | 14 | NOTICE of Errata re: 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events, 7 Notice of Deficiency (Text Only),,, *Party names must be capitalized using proper upper and lower case type* by Plaintiffs Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 07/30/2024) |

| 07/31/2024 | 15 | SERVICE EXECUTED filed by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties: re: SUMMONS IN A CIVIL ACTION; CIVIL COVER SHEET; COMPLAINT; EMERGENCY MOTION FOR IMMEDIATE ORDER TO PROHIBIT USE OF AXON BODY 4 CAMERAS AT POLITICAL EVENTS; ORDER; PRELIMINARY ORDER upon Axon Enterprise, Inc. on July 31, 2024. (Attachments: # 1 Affidavit Proof of Service on Defendant Axon Enterprise, Inc.)(Abhyanker, Raj) (Entered: 07/31/2024) |
|---|---|---|
| 07/31/2024 | 16 | Additional Attachments to Main Document re: 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events *[PROPOSED] ORDER GRANTING EMERGENCY MOTION FOR IMMEDIATE ORDER TO PROHIBIT USE OF AXON BODY 4 CAMERAS AT POLITICAL EVENTS* by Plaintiffs Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 07/31/2024) |
| 08/02/2024 | 17 | NOTICE of Appearance by Pamela Beth Petersen on behalf of Axon Enterprises Incorporated. (Petersen, Pamela) (Entered: 08/02/2024) |
| 08/02/2024 | 18 | NOTICE of Appearance by Gayathiri Shanmuganatha on behalf of Axon Enterprises Incorporated. (Shanmuganatha, Gayathiri) (Entered: 08/02/2024) |
| 08/02/2024 | 19 | Disclosure Statement by Axon Enterprises Incorporated identifying Other Affiliate Vanguard Group Incorporated, Other Affiliate BlackRock Incorporated for Axon Enterprises Incorporated. (Petersen, Pamela) (Entered: 08/02/2024) |
| 08/02/2024 | 20 | SERVICE EXECUTED filed by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties: Proof of Service re: initiating Complaint, Emergency Motion, and supporting documents including the Preliminary Order *NOTIFICATION OF COMPLETION OF SERVICE ON ALL DEFENDANTS AND URGENT REQUEST FOR EXPEDITIOUS HEARING ON EMERGENCY MOTION* upon Microsoft Corporation on August 2, 2024. (Attachments: # 1 Attachment Proof of Service on Defendant Microsoft Corporation)(Abhyanker, Raj) (Entered: 08/02/2024) |
| 08/02/2024 | 21 | Disclosure Statement by GovernmentGPT Incorporated. (Abhyanker, Raj) (Entered: 08/02/2024) |
| 08/02/2024 | 22 | NOTICE of Appearance by Charles W Steese on behalf of Axon Enterprises Incorporated. (Steese, Charles) (Entered: 08/02/2024) |
| 08/02/2024 | 23 | ORDER setting this matter for a Telephonic Status Conference for **Tuesday, August 20, 2024 at 10:30 AM** for the purpose of setting a hearing date. See attached Order for complete details. Signed by Judge Susan M. Brnovich on 8/2/2024. (ESG) (Entered: 08/02/2024) |
| 08/07/2024 | 24 | RESPONSE in Opposition re: 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events filed by Axon Enterprises Incorporated. (Attachments: # 1 Exhibit 1 Declaration of D. MacDonald, # 2 Exhibit 2 Declaration of M. Wyckhouse, # 3 Exhibit 3 Pertinent Emails, # 4 Exhibit 4 Pertinent Pages from Pitch Deck)(Shanmuganatha, Gayathiri) (Entered: 08/07/2024) |
| 08/08/2024 | 25 | REPLY to Response to Motion re: 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events filed by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Attachments: # 1 Affidavit Declaration of Raj V. Abhyanker, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 |

| | | |
|---|---|---|
| | | Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25)(Abhyanker, Raj) (Entered: 08/08/2024) |
| 08/08/2024 | 26 | NOTICE re: NOTICE OF LODGING OF AN AXON BODY 4 IN DISASSEMBLED FORM IN SUPPORT OF PLAINTIFFS EMERGENCY MOTION AND REPLY TO OPPOSITION THERETO by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties re: 25 Reply to Response to Motion,, . (Abhyanker, Raj) (Entered: 08/08/2024) |
| 08/08/2024 | 27 | *MOTION for Leave to File GOVGPTS MOTION FOR LEAVE TO ALLOW NON-ELECTRONIC FILING OF EXHIBIT 18 TO THE DECLARATION OF RAJ ABHYANKER IN SUPPORT OF GOVGPTS REPLY TO DEFENDANT AXONS OPPOSITION OF THE EMERGENCY MOTION by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Attachments: # 1 Proposed Order) (Abhyanker, Raj) *Modified to remove ex parte on 8/9/2024 (DXD). (Entered: 08/08/2024) |
| 08/09/2024 | 28 | MOTION for Extension of Time to File Answer re: 1 Complaint, *Unopposed Motion for Extension of Time to Respond to Complaint* by Axon Enterprises Incorporated. (Attachments: # 1 Proposed Order)(Steese, Charles) (Entered: 08/09/2024) |
| 08/09/2024 | 29 | RESPONSE to Motion re: 28 MOTION for Extension of Time to File Answer re: 1 Complaint, *Unopposed Motion for Extension of Time to Respond to Complaint* filed by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 08/09/2024) |
| 08/12/2024 | 30 | ORDER that the 28 Motion for Extension of Time to Answer is granted. Axon shall answer or otherwise respond to the Complaint on or before **September 13, 2024.** Signed by Judge Susan M. Brnovich on 8/12/2024. (ESG) (Entered: 08/12/2024) |
| 08/13/2024 | 31 | NOTICE re: Service on Defendant Microsoft Corporation by Axon Enterprise Incorporated re: 24 Response in Opposition to Motion, . (Shanmuganatha, Gayathiri) (Entered: 08/13/2024) |
| 08/14/2024 | 32 | NOTICE of Appearance by Jessica Lee Everett-Garcia on behalf of Microsoft Corporation. (Everett-Garcia, Jessica) (Entered: 08/14/2024) |
| 08/14/2024 | 33 | Disclosure Statement by Microsoft Corporation. (Everett-Garcia, Jessica) (Entered: 08/14/2024) |
| 08/14/2024 | 34 | MOTION for Extension of Time to File Answer re: 1 Complaint, *Unopposed Motion for Extension of Time to Respond to Complaint* by Microsoft Corporation. (Attachments: # 1 Attachment Proposed Order)(Everett-Garcia, Jessica) (Entered: 08/14/2024) |
| 08/15/2024 | | Remark: Pro hac vice motion(s) granted for Julia Chapman, Russell Cohen on behalf of Defendant Microsoft Corporation. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 08/15/2024) |
| 08/15/2024 | 35 | ORDER that the 34 Motion for Extension of Time is GRANTED. Defendant Microsoft Corporation shall have until **September 10, 2024** to respond to Plaintiffs' Complaint. Signed by Judge Susan M Brnovich on 8/15/2024. (ESG) (Entered: 08/15/2024) |
| 08/15/2024 | 36 | MOTION for Leave to File Sur-Reply Re Plaintiffs' Emergency Motion by Axon Enterprise Incorporated. (Attachments: # 1 Exhibit A - Proposed Sur-Reply) (Shanmuganatha, Gayathiri) (Entered: 08/15/2024) |
| 08/15/2024 | 37 | **Filed at Doc. 49 ** LODGED Proposed Sur-Reply Re Plaintiffs' Emergency Motion re: 36 MOTION for Leave to File Sur-Reply Re Plaintiffs' Emergency Motion . Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Axon Enterprise Incorporated. (Shanmuganatha, Gayathiri) Modified on 8/20/2024 (DXD). (Entered: 08/15/2024) |

| 08/15/2024 | 38 | MOTION for Leave to File GovGPTS Notice of Motion and Motion for Leave to File Sur-Surreply by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 08/15/2024) |
|---|---|---|
| 08/15/2024 | 39 | **Denied per Order Doc. 48 ** LODGED Proposed GovGPT's Sur-Surreply To Axons Surreply To Emergency Motion For Immediate Order To Prohibit Use Of Axon Body 4 Cameras At Political Events re: 38 MOTION for Leave to File GovGPTS Notice of Motion and Motion for Leave to File Sur-Surreply . Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) Modified on 8/20/2024 (DXD). (Entered: 08/15/2024) |
| 08/16/2024 | 40 | RESPONSE in Opposition re: 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events *Microsoft's Opposition to Plaintiffs' Emergency Motion for AB4 Injunction and Request for Show Cause Order Why Sanctions Should Not Issue* filed by Microsoft Corporation. (Everett-Garcia, Jessica) (Entered: 08/16/2024) |
| 08/16/2024 | 41 | REPLY to Response to Motion re: 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events *Plaintiffs' s Reply To Microsofts Opposition To Emergency Motion For Immediate Order To Prohibit Use Of Axon Body 4 Cameras At Political Events* filed by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 08/16/2024) |
| 08/16/2024 | 42 | NOTICE of Errata re: 41 Reply to Response to Motion, *Errata as to signed date, should be Friday August 16, 2024; fixed* by Plaintiffs Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 08/16/2024) |
| 08/17/2024 | 43 | MOTION to Seal Document 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events *PLAINTIFFS ADMINISTRATIVE MOTION FOR LEAVE TO FILE CONFIDENTIAL DETAILS OF SPECIFIC QUECTEL MODULE INSIDE AXON BODY 4 AND ITS METHOD OF REMOTE AND LOCAL FIRMWARE UPDATES UNDER SEAL, AND REQUEST FOR APPOINTMENT OF TECHNICAL SPECIAL MASTER* by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Attachments: # 1 Supplement Motion, # 2 Supplement Memorandum, # 3 Supplement Declaration, # 4 Exhibit PUBLIC Ex. 1, # 5 Exhibit PUBLIC Ex. 2, # 6 Exhibit PUBLIC Ex. 3)(Abhyanker, Raj) (Entered: 08/17/2024) |
| 08/18/2024 | 44 | SEALED LODGED Proposed (Sealed) Exhibit 1 is a true and correct copy of a document dated in June 2024 which details the firmware update processes for the Quectel module (Model EG065K-NA) used within the Axon Body 4 cameras. (Sealed) Exhibit 2 is a true and correct copy of a document dated in September 2023 which contains the hardware design specifications for the Quectel EG065K series module, which is integrated into the Axon Body 4 cameras. re: 43 MOTION to Seal Document 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events *PLAINTIFFS ADMINISTRATIVE MOTION FOR LEAVE TO FILE CONFIDENTIAL DETAILS OF SPECIFIC QUECTEL MODULE INSIDE AXON BODY 4 AND ITS MET. Document to be filed by Clerk if Motion or Stipulation to Seal is granted. Filed by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Attachments: # 1 Exhibit SEALED EX 1, # 2 Exhibit SEALED EX 2)(Abhyanker, Raj) (Entered: 08/18/2024)* |
| 08/18/2024 | 45 | Additional Attachments to Main Document re: 43 MOTION to Seal Document 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events *PLAINTIFFS ADMINISTRATIVE MOTION FOR LEAVE TO FILE CONFIDENTIAL DETAILS OF SPECIFIC QUECTEL MODULE INSIDE AXON BODY 4 AND ITS MET [PROPOSED] ORDER GRANTING PLAINTIFFS ADMINISTRATIVE MOTION FOR LEAVE TO FILE UNDER SEAL CONFIDENTIAL DOCUMENTS AND* |

| | | |
|---|---|---|
| | | *APPOINTMENT OF TECHNICAL SPECIAL MASTER by Plaintiffs Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 08/18/2024)* |
| 08/19/2024 | 46 | DECLARATION of DECLARATION OF RAJ V. ABHYANKER IN SUPPORT OF PLAINTIFFS ADMINISTRATIVE MOTION FOR REQUEST FOR APPOINTMENT OF TECHNICAL SPECIAL MASTER re: 43 MOTION to Seal Document 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events *PLAINTIFFS ADMINISTRATIVE MOTION FOR LEAVE TO FILE CONFIDENTIAL DETAILS OF SPECIFIC QUECTEL MODULE INSIDE AXON BODY 4 AND ITS MET by Plaintiffs Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Abhyanker, Raj) (Entered: 08/19/2024)* |
| 08/19/2024 | 47 | NOTICE of Errata re: 46 Declaration,, *typo fixed, should be Ex. B instead of Ex. A in "Exhibit C is a true and correct copy of an expanded view of the chart showing the connections between Quectel and the CCP and the Chinese Central Military Commission described as Figure 5 in Exhibit B - January 2023 titled 5 Chinas IoT Ecosystem.* by Plaintiffs Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 08/19/2024) |
| 08/19/2024 | 48 | ORDER granting Defendant Axon's 36 Motion for Leave to File Sur-Reply and denying GovGPT's Notice of Motion and 38 Motion for Leave to File Sur-Surreply. Axon shall file its Sur-Reply within 3 days of this order. Signed by Judge Susan M. Brnovich on 8/19/2024. (ESG) (Entered: 08/19/2024) |
| 08/19/2024 | 49 | SUR-REPLY re: 25 Reply to Response to Motion *Sur-Reply re Emergency Motion* by Defendant Axon Enterprise Incorporated. (Shanmuganatha, Gayathiri) *Modified doc linkage on 8/20/2024 (DXD). (Entered: 08/19/2024) |
| 08/19/2024 | 50 | NOTICE re: NOTICE OF CLARIFICATION WITH RESPECT TO PRO HAC VICE APPLICATION OF RAJ ABHYANKER by Raj Abhyanker re: Remark re Pro Hac Vice Motion . (Abhyanker, Raj) (Entered: 08/19/2024) |
| 08/20/2024 | 51 | MINUTE ENTRY for proceedings held before Judge Susan M. Brnovich: Status Conference held on 8/20/2024. Discussion held. A hearing will not be necessary, and the motion is taken under advisement.<br><br>APPEARANCES: Telephonic appearance by Raj Abhyanker and Spencer Keller for Plaintiffs. Telephonic appearance by Charles Steese, Pamela Petersen and Gayathiri Shanmuganatha for Defendant Axon Enterprise Incorporated. Telephonic appearance by Julia Chapman, Russell Cohen and Jessic Everett-Garcia for Defendant Microsoft Corporation. Alos present Microsoft Representative David Smutney. (Court Reporter Christine Coaly) Hearing held 10:30 AM to 10:34 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (ESG) (Entered: 08/20/2024) |
| 08/23/2024 | 52 | **Withdrawn per (Doc. 58 )** MOTION to Stay re: 51 Status Conference *REQUEST FOR CLARIFICATION AND MOTION FOR LIMITED STAY OF ORDER ON EMERGENCY MOTION* by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Attachments: # 1 Attachment Declaration of Raj Abhyanker, # 2 Proposed Order, # 3 Exhibit A) (Abhyanker, Raj) *Modified text on 8/26/2024 (DXD). Modified on 9/5/2024 (DXD). (Entered: 08/23/2024) |
| 08/30/2024 | 53 | NOTICE re: Notice Of Voluntary Dismissal Of Only The Violation Of The California Consumer Privacy Act (CCPA) Cause Of Action Without Prejudice by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties re: 1 Complaint, *Notice Of Voluntary* |

| | | |
|---|---|---|
| | | *Dismissal Of Only The Violation Of The California Consumer Privacy Act (CCPA) Cause Of Action Without Prejudice.* (Abhyanker, Raj) (Entered: 08/30/2024) |
| 09/03/2024 | 54 | RESPONSE in Opposition re: 43 MOTION to Seal Document 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events *PLAINTIFFS ADMINISTRATIVE MOTION FOR LEAVE TO FILE CONFIDENTIAL DETAILS OF SPECIFIC QUECTEL MODULE INSIDE AXON BODY 4 AND ITS MET, 52 MOTION to Stay re: 51 Status Conference,,, Common Prompts (Text Only),, REQUEST FOR CLARIFICATION AND MOTION FOR LIMITED STAY OF ORDER ON EMERGENCY MOTION filed by Axon Enterprise Incorporated. (Attachments: # 1 Exhibit Declaration of M. Zhou, # 2 Exhibit Declaration of M. Kaster, # 3 Exhibit CA Ethical Rules) (Shanmuganatha, Gayathiri) (Entered: 09/03/2024)* |
| 09/03/2024 | 55 | MOTION for Leave to File Separate Dispositive Motions and Exceed Page Limit by Axon Enterprise Incorporated. (Attachments: # 1 Proposed Order)(Shanmuganatha, Gayathiri) (Entered: 09/03/2024) |
| 09/04/2024 | 56 | RESPONSE in Opposition re: 55 MOTION for Leave to File Separate Dispositive Motions and Exceed Page Limit *PLAINTIFFS OPPOSITION TO DEFENDANTS AXONS MOTION FOR LEAVE TO FILE SEPARATE DISPOSITIVE MOTIONS AND EXCEED PAGE LIMIT* filed by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Attachments: # 1 Proposed Order)(Abhyanker, Raj) (Entered: 09/04/2024) |
| 09/04/2024 | 57 | REPLY to Response to Motion re: 43 MOTION to Seal Document 2 MOTION for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events *PLAINTIFFS ADMINISTRATIVE MOTION FOR LEAVE TO FILE CONFIDENTIAL DETAILS OF SPECIFIC QUECTEL MODULE INSIDE AXON BODY 4 AND ITS MET PLAINTIFFS REPLY TO DEFENDANT AXONS OPPOSITION TO ADMINISTRATIVE MOTION FOR LEAVE TO FILE CONFIDENTIAL DETAILS OF SPECIFIC QUECTEL MODULE INSIDE AXON BODY 4 AND ITS METHOD OF REMOTE AND LOCAL FIRMWARE UPDATES UNDER SEAL, AND REQUEST FOR APPOINTMENT OF TECHNICAL SPECIAL MASTER filed by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 09/04/2024)* |
| 09/04/2024 | 58 | WITHDRAWAL OF DOCUMENT re: 52 MOTION to Stay re: 51 Status Conference,,, Common Prompts (Text Only),, *REQUEST FOR CLARIFICATION AND MOTION FOR LIMITED STAY OF ORDER ON EMERGENCY MOTION NOTICE OF WITHDRAWAL OF REQUEST FOR CLARIFICATION AND MOTION FOR LIMITED STAY OF ORDER ON EMERGENCY MOTION* by Plaintiffs Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 09/04/2024) |
| 09/04/2024 | 59 | REPLY to Response to Motion re: 55 MOTION for Leave to File Separate Dispositive Motions and Exceed Page Limit filed by Axon Enterprise Incorporated. (Shanmuganatha, Gayathiri) (Entered: 09/04/2024) |
| 09/05/2024 | 60 | NOTICE of Errata re: 57 Reply to Response to Motion,, *The Reply ECF 57 erroneously describes Exhibits 1 and 2 and Exhibits A and B, but from the context, the meanings of Exhibits A and B when referencing Quectel documents are Exhibits 1 and 2 as lodged under seal as ECF 44. A corrected version of ECF 57 with track changes is provided* by Plaintiffs Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 09/05/2024) |
| 09/05/2024 | 61 | *AMENDED REPLY to Response to Motion re: 43 Reply to Response to Motion, filed by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) *Modified event, text, and document link on 9/6/2024 (REK). (Entered: 09/05/2024) |
| 09/05/2024 | 62 | DECLARATION of Raj Abhyanker ISO of Reply re: 57 Reply to Response to Motion,, 61 Reply *DECLARATION OF RAJ V. ABHYANKER IN SUPPORT OF REPLY TO* |

| | | |
|---|---|---|
| | | *PLAINTIFFS ADMINISTRATIVE MOTION FOR LEAVE TO FILE CONFIDENTIAL DETAILS OF SPECIFIC QUECTEL MODULE INSIDE AXON BODY 4* by Plaintiffs Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Abhyanker, Raj) (Entered: 09/05/2024) |
| 09/06/2024 | 63 | *MOTION to Amend/Correct 1 Complaint *MOTION FOR LEAVE TO AMEND COMPLAINT AGAINST MICROSOFT CORPORATION ONLY* by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties. (Attachments: # 1 Attachment Proposed First Amended Complaint, # 2 Proposed Order) (Abhyanker, Raj) *Modified to correct event/ add doc link on 9/9/2024 (DXD). (Entered: 09/06/2024) |
| 09/09/2024 | 64 | *MOTION to Dismiss Party *Voluntary Dismissal without Prejudice of Microsoft Corporation as to the First Cause of Action* by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties re: 1 Complaint. (Abhyanker, Raj) *Modified from notice to motion on 9/10/2024 (DXD). (Entered: 09/09/2024) |
| 09/09/2024 | 65 | NOTICE re: Non-Opposition by Axon Enterprise Incorporated re: 63 MOTION to Amend/Correct 1 Complaint . (Attachments: # 1 Proposed Order)(Shanmuganatha, Gayathiri) (Entered: 09/09/2024) |
| 09/10/2024 | 66 | MOTION to Dismiss for Failure to State a Claim *and, in the alternative, Motion to Strike Relief and Class Allegations* by Microsoft Corporation. (Attachments: # 1 Attachment Certificate of Conferral)(Everett-Garcia, Jessica) (Entered: 09/10/2024) |
| 09/13/2024 | 67 | MOTION to Dismiss Counts/Claims : 1-7, 9-11, 13 *for Lack of Standing* by Axon Enterprise Incorporated. (Steese, Charles) (Entered: 09/13/2024) |
| 09/13/2024 | 68 | MOTION to Dismiss for Failure to State a Claim by Axon Enterprise Incorporated. (Attachments: # 1 Appendix A)(Steese, Charles) (Entered: 09/13/2024) |
| 09/16/2024 | 69 | NOTICE re: NOTICE OF VOLUNTARY WITHDRAWAL OF MOTION FOR LEAVE TO AMEND COMPLAINT AGAINST MICROSOFT CORPORATION by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties re: 63 MOTION to Amend/Correct 1 Complaint . (Abhyanker, Raj) (Entered: 09/16/2024) |
| 09/16/2024 | 70 | NOTICE re: NOTICE OF VOLUNTARY WITHDRAWAL OF GOVGPTS MOTION FOR LEAVE TO ALLOW NON-ELECTRONIC FILING OF EXHIBIT 18 by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties re: 27 MOTION for Leave to File GOVGPTS MOTION FOR LEAVE TO ALLOW NON-ELECTRONIC FILING OF EXHIBIT 18 TO THE DECLARATION OF RAJ ABHYANKER IN SUPPORT OF GOVGPTS REPLY TO DEFENDANT AXONS OPPOSITION OF THE EMERGENCY MOTION . (Abhyanker, Raj) (Entered: 09/16/2024) |
| 09/18/2024 | 71 | ORDER denying Plaintiff's 2 Motion for Preliminary Injunction. IT IS FURTHER ORDERED that Plaintiffs and Defendants shall attend an in-person show cause hearing on **October 21, 2024 at 10:00 a.m. (45 minutes allowed)** to determine whether sanctions should be imposed. Plaintiffs' counsel should be prepared to justify the filing of the "emergency motion" absent any actual testing of the Bodycams and repeated allegations that a Quectel "chip" is used in the Bodycam. Signed by Judge Susan M. Brnovich on 9/18/2024. (ESG) (Entered: 09/18/2024) |
| 09/19/2024 | 72 | NOTICE re: Notice Of Voluntary Dismissal Of Plaintiffs Counsel Spencer Keller by Raj Abhyanker, GovernmentGPT Incorporated, Unknown Parties . (Abhyanker, Raj) (Entered: 09/19/2024) |
| 09/20/2024 | 73 | **Deficiency was filed in error. All docket text associated with the entry has been removed. Modified on 9/20/2024 (DXD). (Entered: 09/20/2024) |

| | | |
|---|---|---|
| 09/22/2024 | 74 | First AMENDED COMPLAINT against Axon Enterprise Incorporated, Microsoft Corporation, Safariland LLC filed by GovernmentGPT Incorporated. (Attachments: # 1 Summons Proposed Summons to Safariland LLC)(Abhyanker, Raj) (Entered: 09/22/2024) |
| 09/22/2024 | 75 | SUMMONS Submitted by GovernmentGPT Incorporated. (Abhyanker, Raj) (Entered: 09/22/2024) |
| 09/23/2024 | 76 | Summons Issued as to Safariland LLC. (BAS). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 09/23/2024) |
| 09/23/2024 | 77 | NOTICE TO FILER OF DEFICIENCY re: 74 Amended Complaint. Document not in compliance with LRCiv 15.1(b) - The amending party must file a separate notice of filing the amended pleading. ***FOLLOW-UP ACTION REQUIRED:*** Please use event Notice of Filing - Amended Pleading (LRCiv 15.1(b)) and attach a copy of the amended pleading that indicates in what respect it differs from the pleading which it amends, by bracketing or striking through the text that was deleted and underlining the text that was added. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (DXD) (Entered: 09/23/2024) |
| 09/23/2024 | 78 | MINUTE ORDER: Supplemental Request for Copyright, Trademark, or Patent Information. This case has been designated as a copyright, trademark, or patent case. An answer, amended complaint, or other pleading 74 has been filed that may include additional trademarks, patents, or copyrights allegedly violated that were not previously included. Attached to this docket entry are the required form(s) that may need to be completed by the party who filed the above document.<br><br>If your recently filed pleading adds or changes information related to the original patents, trademarks, or copyright allegations, please complete the form that is applicable to this particular case. In some cases, you may need to complete both forms. Within seven (7) days, you must submit the required form(s) to the Clerk's Office. Please complete the form and file it with the Court using the specific event: ***Notice of Filing - Copyright, Trademark or Patent Information***, found under the Other Filings header. Please DO NOT mail the form directly to the Patent or Copyright Office. The Clerk's Office will submit the form.<br><br>If there are no changes to the copyright, trademark, or patent information previously submitted for this case, then the party who filed the above document must file a Notice, within seven (7) days, indicating such using the specific event: ***Notice of Filing - Copyright, Trademark and Patent Information***, found under the Other Filings header. (DXD) (Entered: 09/23/2024) |
| 09/27/2024 | 79 | First MOTION for Extension of Time to File Answer re: 74 Amended Complaint by Axon Enterprise Incorporated. (Attachments: # 1 Exhibit A - Comparison of GovGPT Complaints, # 2 Proposed Order)(Shanmuganatha, Gayathiri) (Entered: 09/27/2024) |
| 09/27/2024 | 80 | RESPONSE in Opposition re: 79 First MOTION for Extension of Time to File Answer re: 74 Amended Complaint filed by GovernmentGPT Incorporated. (Abhyanker, Raj) (Entered: 09/27/2024) |
| 09/28/2024 | 81 | NOTICE of Filing Amended Pleading pursuant to LRCiv 15.1(b) by GovernmentGPT Incorporated *NOTICE OF FILING - AMENDED PLEADING (LRCiv 15.1(b))*. (Abhyanker, Raj) (Entered: 09/28/2024) |
| 09/28/2024 | 82 | *Additional Attachments to Main Document re: 81 Notice of Filing - Amended Pleading (LRCiv 15.1(b)) by Plaintiff GovernmentGPT Incorporated. *Exhibit 1 (Amended Pleading* |

| | | |
|---|---|---|
| | | *with Added/Deleted text marked*. (Abhyanker, Raj) *Modified to correct event and text on 9/30/2024 (REK). (Entered: 09/28/2024) |
| 09/30/2024 | 83 | REPLY to Response to Motion re: 79 First MOTION for Extension of Time to File Answer re: 74 Amended Complaint filed by Axon Enterprise Incorporated. (Attachments: # 1 Exhibit A)(Shanmuganatha, Gayathiri) (Entered: 09/30/2024) |
| 09/30/2024 | 84 | REQUEST re: Expedited Consideration *re Motion to Extend Time to Respond to First Amended Complaint and Exceed Page Limit* by Defendant Axon Enterprise Incorporated. (Shanmuganatha, Gayathiri) (Entered: 09/30/2024) |
| 09/30/2024 | 85 | *Withdrawn by 86 *LODGED Proposed [PROPOSED] ORDER DENYING DEFENDANTS MOTION FOR EXTENSION OF TIME AND MOTION TO EXCEED PAGE LIMITS re: 79 First MOTION for Extension of Time to File Answer re: 74 Amended Complaint . Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by GovernmentGPT Incorporated. (Abhyanker, Raj) Modified on 10/1/2024 (REK). (Entered: 09/30/2024) |
| 09/30/2024 | 86 | *Additional Attachment re: 80 Response in Opposition and NOTICE of Errata re: 85 Lodged Proposed Document, *previous was the wrong proposed order, this is the correct PROPOSED] ORDER DENYING DEFENDANTS MOTION FOR EXTENSION OF TIME AND MOTION TO EXCEED PAGE LIMITS* by Plaintiff GovernmentGPT Incorporated. (Abhyanker, Raj) *Modified text on 10/1/2024 (REK). (Entered: 09/30/2024) |
| 09/30/2024 | 87 | SERVICE EXECUTED filed by GovernmentGPT Incorporated: Proof of Service re: Complaint, Preliminary Order, opening papers upon Safariland, Inc. on 9/23/2024. (Abhyanker, Raj) (Entered: 09/30/2024) |
| 10/01/2024 | 88 | ORDER that Axon shall answer or otherwise respond to the Amended Complaint on or before **October 28, 2024.** IT IS ORDERED that Axon's responsive pleading shall not exceed 25 pages. Signed by Judge Susan M. Brnovich on 10/1/12024. (ESG) (Entered: 10/01/2024) |
| 10/04/2024 | 89 | MINUTE ORDER: <u>SECOND</u> Supplemental Request for Copyright, Trademark, or Patent Information. This case has been designated as a copyright, trademark, or patent case. An answer, amended complaint, or other pleading 74 has been filed that may include additional trademarks, patents, or copyrights allegedly violated that were not previously included. Attached to this docket entry are the required form(s) that may need to be completed by the party who filed the above document.<br><br>If your recently filed pleading adds or changes information related to the original patents, trademarks, or copyright allegations, please complete the form that is applicable to this particular case. In some cases, you may need to complete both forms. Within seven (7) days, you must submit the required form(s) to the Clerk's Office. Please complete the form and file it with the Court using the specific event: ***Notice of Filing - Copyright, Trademark or Patent Information***, found under the Other Filings header. Please DO NOT mail the form directly to the Patent or Copyright Office. The Clerk's Office will submit the form.<br><br><u>If there are no changes to the copyright, trademark, or patent information previously submitted for this case</u>, then the party who filed the above document must file a Notice, within seven (7) days, indicating such using the specific event: ***Notice of Filing - Copyright, Trademark or Patent Information***, found under the Other Filings header. (ESG) (Entered: 10/04/2024) |
| 10/07/2024 | 90 | MOTION to Dismiss for Failure to State a Claim *Microsoft Corporation's Motion to Dismiss Plaintiff's First Amended Complaint for Failure to State a Claim* by Microsoft |

| | | |
|---|---|---|
| | | Corporation. (Attachments: # 1 Attachment Declaration, # 2 Attachment Certificate of Conferral, # 3 Exhibit A-C, # 4 Exhibit D-F)(Everett-Garcia, Jessica) (Entered: 10/07/2024) |
| 10/07/2024 | 91 | NOTICE of Errata re: 90 MOTION to Dismiss for Failure to State a Claim *Microsoft Corporation's Motion to Dismiss Plaintiff's First Amended Complaint for Failure to State a Claim* by Defendant Microsoft Corporation.. (Attachments: # 1 Attachment Motion to Dismiss with footnote update)(Everett-Garcia, Jessica) (Entered: 10/07/2024) |
| 10/09/2024 | 92 | First MOTION for Extension of Time to File Answer *to First Amended Complaint*, First MOTION for Leave to File Excess Pages for Answer to First Amended Complaint by Safariland LLC. (Attachments: # 1 Attachment Exhibit 1, # 2 Proposed Order)(Fischer, Ian) (Entered: 10/09/2024) |
| 10/10/2024 | 93 | ORDER granting the 92 Motion Extension of Time to Respond to Complaint and Exceed Page Limit and extending Defendant Safariland, LLC's deadline to answer or otherwise respond to Plaintiff's First Amended complaint until **October 28, 2024.** IT IS FURTHER ORDERED that Defendant Safariland, LLC's responsive motion may not exceed 25 pages. Signed by Judge Susan M. Brnovich on 10/10/2024. (ESG) (Entered: 10/10/2024) |
| 10/12/2024 | 94 | RESPONSE in Opposition re: 90 MOTION to Dismiss for Failure to State a Claim *Microsoft Corporation's Motion to Dismiss Plaintiff's First Amended Complaint for Failure to State a Claim* filed by GovernmentGPT Incorporated. (Attachments: # 1 Supplement Declaration of Raj Abhyanker, # 2 Proposed Order)(Abhyanker, Raj) (Entered: 10/12/2024) |
| 10/13/2024 | 95 | DECLARATION of Declaration of Raj Abhyanker In Support of Plaintiffs Opposition to Microsofts Motion to Dismiss the First Amended Complaint re: 94 Response in Opposition to Motion, *w/ Exhibit 1*. filed by GovernmentGPT Incorporated. (Attachments: # 1 Exhibit 1)(Abhyanker, Raj) (Entered: 10/13/2024) |
| 10/15/2024 | 96 | Disclosure Statement by Safariland LLC identifying Corporate Parent Cadre Holdings, Inc. for Safariland LLC. (Fischer, Ian) (Entered: 10/15/2024) |
| 10/21/2024 | 97 | MINUTE ENTRY for proceedings held before Judge Susan M. Brnovich: Show Cause Hearing held on 10/21/2024. Oral argument held. IT IS ORDERED that Axon Enterprise Incorporated attorney fees and costs in relation to the Motion for Preliminary Injunction. Defense counsel shall submit the required affidavit and request by no later than November 1, 2024, and any objections to the reasonableness should be filed by November 8, 2024. IT IS FURTHER ORDERED that sanctions be imposed as to attorney Raj Abhyanker only.

APPEARANCES: Attorney Raj Abhyanker for Plaintiff with Attorney Spencer Keller. Attorneys Gayathiri Shanmuganatha, Pamela Petersen and Charles Steese for Defendant Axon Enterprise Incorporated. Attorney Jessica Everett-Garcia for Defendant Microsoft Corporation. Attorney Ian Fischer for Defendant Safariland, LLC. (Court Reporter Christine Coaly) Hearing held 10:04 AM to 10:54 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (ESG) (Entered: 10/21/2024) |
| 10/21/2024 | 98 | TRANSCRIPT REQUEST by GovernmentGPT Incorporated for proceedings held on 10/21/2024, Judge Susan M Brnovich hearing judge(s). (Abhyanker, Raj) (Entered: 10/21/2024) |
| 10/21/2024 | 99 | *REPLY to Response to Motion re: 90 MOTION to Dismiss for Failure to State a Claim *Microsoft Corporation's Motion to Dismiss Plaintiff's First Amended Complaint for Failure to State a Claim* by Defendant Microsoft Corporation. (Everett-Garcia, Jessica) *Modified to correct event on 10/22/2024 (DXD). (Entered: 10/21/2024) |

| | | |
|---|---|---|
| 10/21/2024 | 100 | NOTICE TO FILER OF DEFICIENCY re: 98 Transcript Request filed by GovernmentGPT Incorporated. The CAND 435 form used is not AZD district specific. Transcript requests must be submitted on form AO 435/AZ Form (Rev. 10/2023). ***FOLLOW-UP ACTION REQUIRED:*** Please refile the transcript request using the most current version, AO 435/AZ Form (Rev. 10/2023), available at the district's webpage under Forms. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SCH) (Entered: 10/21/2024) |
| 10/21/2024 | 101 | AMENDED TRANSCRIPT REQUEST pursuant to 100 Notice of Deficiency by GovernmentGPT Incorporated for proceedings held on 10/21/2024, Judge Susan M Brnovich hearing judge(s). (Abhyanker, Raj) (Entered: 10/21/2024) |
| 10/22/2024 | 102 | TRANSCRIPT REQUEST by Axon Enterprise Incorporated for proceedings held on 10/21/2024, Judge Susan M Brnovich hearing judge(s). (Shanmuganatha, Gayathiri) (Entered: 10/22/2024) |
| 10/24/2024 | 103 | Second MOTION for Extension of Time to File Answer re: 74 Amended Complaint by Safariland LLC. (Attachments: # 1 Proposed Order)(Fischer, Ian) (Entered: 10/24/2024) |
| 10/25/2024 | 104 | ORDER granting the Motion (Doc. 103 ) and extending Defendant Safariland, LLC's deadline to answer or otherwise respond to Plaintiff's First Amended complaint until November 4, 2024. Signed by Judge Susan M Brnovich on 10/25/2024. (LFIG) (Entered: 10/25/2024) |
| 10/28/2024 | 105 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of SHOW CAUSE HEARING proceedings held on 10/21/2024 before Judge SUSAN M. BRNOVICH. [Court Reporter: Christine M. Coaly, RMR, CRR, Telephone number (602) 322-7248]. The ordering party receives the transcript directly from the Court Reporter. Therefore, transcripts should not be viewed through Pacer. A non-ordering party may view a transcript at the court's public terminal or purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through Pacer. Redaction Request due 11/18/2024. Redacted Transcript Deadline set for 11/29/2024. Release of Transcript Restriction set for 1/27/2025. (RAP) (Entered: 10/28/2024) |
| 10/28/2024 | 106 | MOTION to Dismiss for Failure to State a Claim *(GovGPT's FAC)* by Axon Enterprise Incorporated. (Attachments: # 1 Exhibit 1 - 3)(Shanmuganatha, Gayathiri) (Entered: 10/28/2024) |
| 10/30/2024 | 107 | STIPULATION by Axon Enterprise Incorporated. (Attachments: # 1 Proposed Order) (Shanmuganatha, Gayathiri) (Entered: 10/30/2024) |
| 10/31/2024 | 108 | ORDER pursuant to the 107 Stipulation, IT IS ORDERED that Plaintiff shall file its opposition to Axon's Motion on or before **December 2, 2024** and Plaintiff's opposition shall not exceed 25 pages. IT IS FURTHER ORDERED that Axon shall file its reply in support of its Motion on or before **December 20, 2024** and Axon's reply shall not exceed 15 pages. Signed by Judge Susan M. Brnovich on 10/31/2024. (ESG) (Entered: 10/31/2024) |
| 11/01/2024 | 109 | MOTION for Attorney Fees by Axon Enterprise Incorporated. (Attachments: # 1 Exhibits A-D)(Shanmuganatha, Gayathiri) (Entered: 11/01/2024) |
| 11/04/2024 | 110 | MOTION to Dismiss for Lack of Jurisdiction by Safariland LLC. (Attachments: # 1 Exhibit Ex 1 Declaration of Julio Salvador)(Fischer, Ian) (Entered: 11/04/2024) |
| 11/04/2024 | 111 | MOTION to Dismiss for Failure to State a Claim by Safariland LLC. (Fischer, Ian) (Entered: 11/04/2024) |

| | | |
|---|---|---|
| 11/05/2024 | 112 | MOTION for Leave to File Excess Pages for Plaintiff requests permission to file its response to Defendants Motion for Attorney Fees by November 8, 2024 not to exceed 25 pages re: 109 MOTION for Attorney Fees, 97 Show Cause Hearing by GovernmentGPT Incorporated. (Attachments: # 1 Proposed Order)(Abhyanker, Raj) (Entered: 11/05/2024) |
| 11/06/2024 | 113 | Additional Attachments to Main Document re: 106 MOTION to Dismiss for Failure to State a Claim *(GovGPT's FAC) - Proposed Order* by Defendant Axon Enterprise Incorporated. (Shanmuganatha, Gayathiri) (Entered: 11/06/2024) |
| 11/07/2024 | 114 | ORDER denying 112 Motion for Leave to File Excess Pages. Signed by Judge Susan M Brnovich on 11/6/24. (DXD) (Entered: 11/07/2024) |
| 11/08/2024 | 115 | RESPONSE in Opposition re: 109 MOTION for Attorney Fee, MOTION for Reconsideration of Sanctions filed by GovernmentGPT Incorporated, Raj Abhyanker. (Attachments: # 1 Affidavit of Raj Abhyanker, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Proposed Order)(Abhyanker, Raj) *Modified to add motion on 11/12/2024 (DXD). (Entered: 11/08/2024) |
| 11/12/2024 | 116 | RESPONSE in Opposition re: 111 MOTION to Dismiss for Failure to State a Claim *with respect to Safariland* filed by GovernmentGPT Incorporated. (Abhyanker, Raj) *Modified to remove doc link on 11/13/2024 (DXD). (Entered: 11/12/2024) |
| 11/12/2024 | 117 | RESPONSE to Motion re: 110 MOTION to Dismiss for Lack of Jurisdiction *PLAINTIFFS OPPOSITION TO SAFARILANDS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT FOR A LACK OF JURISDICTION* filed by GovernmentGPT Incorporated. (Abhyanker, Raj) (Entered: 11/12/2024) |
| 11/19/2024 | 118 | REPLY to Response to Motion re: 109 MOTION for Attorney Fees filed by Axon Enterprise Incorporated. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Shanmuganatha, Gayathiri) (Entered: 11/19/2024) |
| 11/19/2024 | 119 | REPLY to Response to Motion re: 111 MOTION to Dismiss for Failure to State a Claim filed by Safariland LLC. (Fischer, Ian) (Entered: 11/19/2024) |
| 11/20/2024 | | Remark: Pro hac vice motion(s) granted for James Granger Kress on behalf of Defendant Safariland LLC. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 11/20/2024) |
| 11/27/2024 | 120 | REPLY to Response to Motion re: 110 MOTION to Dismiss for Lack of Jurisdiction filed by Safariland LLC. (Fischer, Ian) (Entered: 11/27/2024) |
| 12/02/2024 | 121 | RESPONSE in Opposition re: 106 MOTION to Dismiss for Failure to State a Claim *(GovGPT's FAC) PLAINTIFF OPPOSITION TO AXONS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT* filed by GovernmentGPT Incorporated. (Abhyanker, Raj) (Entered: 12/02/2024) |
| 12/20/2024 | 122 | REPLY to Response to Motion re: 106 MOTION to Dismiss for Failure to State a Claim *(GovGPT's FAC) Axon's Reply in Support of its Motion to Dismiss* filed by Axon Enterprise Incorporated. (Petersen, Pamela) (Entered: 12/20/2024) |
| 12/20/2024 | 123 | NOTICE re: Notice of Related Case and Intention to Seek Motion before the Judicial Panel on Multidistrict Litigation to Consolidate and Transfer the Cases to One District for Pretrial Proceedings under 28 U.S.C. § 1407 by GovernmentGPT Incorporated, Raj Abhyanker . (Abhyanker, Raj) (Entered: 12/20/2024) |
| 12/23/2024 | 124 | NOTICE re: NOTICE OF MOTION TO CONSOLIDATE AND TRANSFER CASES FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS TO THE DISTRICT OF NEW JERSEY PURSUANT TO 28 U.S.C. § 1407 by GovernmentGPT |

Incorporated . (Attachments: # 1 Exhibit Motion in Judicial Panel on Multidistrict Litigation, assigned Case No. MDL No. 1:24-P-86)(Abhyanker, Raj) (Entered: 12/23/2024)

UNITED STATES DISTRICT COURT DISTRICT OF ARIZONA

### Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the District of Arizona.

**The completed cover sheet must be printed directly to PDF and filed as an attachment to the Complaint or Notice of Removal.**

| | |
|---|---|
| **Plaintiff**(s): **GOVERNMENTGPT, INC. , ; RAJ ABHYANKER , ; Municipality and Police Departments DOES 1-500 , ;** | **Defendant**(s): **AXON ENTERPRISE, INC. , ; MICROSOFT CORPORATION , ; DOES 1-50 , ;** |
| County of Residence: Outside the State of Arizona | County of Residence: Maricopa |
| County Where Claim For Relief Arose: Maricopa | |
| Plaintiff's Atty(s): | Defendant's Atty(s): |
| **Spencer Keller ,** LegalForce 446 E. Southern Ave. Tempe, Arizona  85282 (650) 390-6397 | , , |

---

**IFP REQUESTED**

---

**REMOVAL FROM COUNTY, CASE #**

---

| | |
|---|---|
| <u>II. Basis of Jurisdiction</u>: | **3. Federal Question (U.S. not a party)** |
| <u>III. Citizenship of Principal Parties</u>(**Diversity Cases Only**) | |
| Plaintiff:- | **2 Citizen of Another State** |
| Defendant:- | **1 Citizen of This State** |
| <u>IV. Origin</u> : | **1. Original Proceeding** |
| <u>V. Nature of Suit</u>: | **410 Anti**trust |
| <u>VI.Cause of Action</u>: | **DECLARATORY JUDGMENT; CONSPIRACY TO RESTRAIN TRADE, SHERMAN ACT, 15 U.S.C. §1; CONSPIRACY TO RESTRAIN TRADE, SHERMAN ACT, 15 U.S.C. §2; VIOLATION OF SECTION 7 OF THE CLAYTON ACT (15 U.S.C. § 18) VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) VIOLATION OF THE CARTWRIGHT ACT (UNREASONABLE RESTRAINT OF TRADE) VIOLATION OF THE CARTWRIGHT ACT (CONSPIRACY TO MONOPOLIZE) FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. 1125(a) ARIZONA CONSUMER FRAUD ACT (ARIZONA REVISED STATUTES (A.R.S.) § 44-1522 ARIZONA UNIFORM STATE ANTITRUST ACT A.R.S. § 44-1401 ET SEQ SECTION 7(2) OF THE ILLINOIS ANTITRUST ACT VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT (CCPA) ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (ICFA)** |
| <u>VII. Requested in Complaint</u> | |
| Class Action: | **Yes** |

Dollar Demand: **$500,000,000**

Jury Demand: **Yes**

<u>VIII. This case</u> **IS RELATED** to Case Number **2:24-at-99907** assigned to Judge <u>.</u>

---

**Signature:** <u>/Spencer Keller/</u>

   **Date:** <u>7/29/2024</u>

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, save this form as a PDF and include it as an attachment to your case opening documents.

Revised: 01/2014

1  RAJ V. ABHYANKER, California SBN 233,284
2  Email: raj@legalforcelaw.com

3

4  **LEGALFORCE RAPC WORLDWIDE, P.C.**
5  1580 W. El Camino Real, Suite 10
   Mountain View, CA 94040
6  Telephone: (650) 965-8731

7  Attorney for Plaintiff

8

9      UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

10

11  GovernmentGPT, Inc.,                    Case No. CV-24-01869-PHX-SMB
                                            Judge: Hon. Judge Susan M Brnovich
12           Plaintiff,

13                                          **FIRST AMENDED COMPLAINT FOR:**
         v.                                 1. FALSE ADVERTISING UNDER THE
14                                             LANHAM ACT, 15 U.S.C. 1125(a)
15  Axon Enterprise, Inc., formerly         2. VIOLATION OF SECTION 7 OF THE
    d/b/a Taser International, Inc.,            CLAYTON ACT, 15 U.S.C. § 18
16  Microsoft Corporation,                  3. CONSPIRACY TO RESTRAIN TRADE
    Safariland, LLC.                           VIOLATION OF SECTION 1 OF THE
17                                             SHERMAN ACT, 15 U.S.C. § 1
18                                          4. VIOLATION OF SECTION 2 OF THE
             Defendants.                       SHERMAN ACT, 15 U.S.C. § 2 -
19                                             MONOPOLIZATION
20                                          5. VIOLATION OF SECTION 2 OF THE
                                               SHERMAN ACT, 15 U.S.C. § 2 -
21                                             ATTEMPTED MONOPOLIZATION
22                                          6. VIOLATION OF SECTION 2 OF THE
                                               SHERMAN ACT, 15 U.S.C. § 2 -
23                                             CONSPIRACY TO MONOPOLIZE
24                                          7. CALIFORNIA UNFAIR
                                               COMPETITION (CAL. BUS. & PROF.
25                                             CODE § 17200 ET SEQ.)
26
27                                          **JURY TRIAL DEMANDED**

28

**FIRST AMENDED COMPLAINT**

1.  This is an action for damages and injunctive relief under the federal antitrust laws to redress injuries to competition caused by Axon Enterprise, Inc. ("Axon") Microsoft Corporation ("Microsoft"), and Safariland, LLC ("Safariland").

**INTRODUCTION**

2.  Axon holds a dominant position in the market for body-worn cameras and digital evidence management systems for over 94.4% of all law enforcement agencies in the United States.[1]  Axon leverages its market power by integrating its body-worn cameras with its proprietary digital evidence management platform, Evidence.com, creating a closed ecosystem that discourages competition.

3.  This lawsuit aims to restore fair competition in the market for Body-Worn Cameras (BWCs), Digital Evidence Management Systems, and Public Safety Video Integration and Management Platforms.

**THE PARTIES**

4.  Plaintiff GovGPT is a Delaware corporation with its principal place of business at 1580 W. El Camino Real Suite 14, Mountain View California 94040. GovGPT is an early stage startup which develops and markets innovative artificial intelligence technologies, 360 degree and networked body cameras, drones, and advanced digital

---

[1] As of 2020, Axon reported having a customer relationship with 17,000 of the nation's 18,000 law enforcement agencies (94.4%).  Akela Lacy, *Two Companies Fight To Corner The Police Body Camera Market*, INTERCEPT, (Dec. 8, 2021), (last viewed Sept. 22, 2024), https://t.co/3HqLDySGCH.

evidence management software powered by artificial intelligence for law enforcement agencies.

5. Defendant Axon is a Delaware corporation with its principal place of business at 17800 North 85th Street, Scottsdale, AZ 85255. Axon designs, manufactures, and sells body-worn cameras, anti-drone technology, real time crime center, and digital evidence management systems under the brand Evidence.com.

6. Defendant Microsoft is a publicly traded technology company incorporated in the State of Washington with headquarters 1 Microsoft Way, Redmond, Washington 98052. Microsoft operates datacenters in El Mirage and Goodyear, Arizona (known as "West US 3"), part of the Greater Phoenix area in this district.

7. Defendant Safariland, LLC is a limited liability company organized and existing under the laws of the State of Delaware. Safariland is wholly owned by Cadre Holdings, Inc., a corporation organized and existing under the laws of the State of Delaware. Cadre Holdings' principal place of business is located at 13386 International Parkway, Jacksonville, Florida 32218.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under federal question (28 U.S.C. § 1331) over Axon because Axon violated the Lanham Act. This court has supplemental jurisdiction over the California UCL claim under 28 U.S.C. § 1367 because the UCL claim arises from the same nucleus of operative facts as the Lanham Act claim.

9. Alternatively, if this Court finds that it has no federal question jurisdiction over

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

the Lanham Act claim, Plaintiff requests this Court to exercise diversity jurisdiction (28 U.S.C. § 1332) over the California UCL claim because Plaintiff and Axon are citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10. With respect to claims alleged against Axon, Microsoft, and Safariland, this action arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1-2), and Section 7 of the Clayton Act (15 U.S.C. §§ 18).

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

12. This Court has personal jurisdiction over Axon, Microsoft and Safariland because they transacted business, maintained substantial contacts, and committed overt acts in furtherance of their market-allocation conspiracy and conspiracy to monopolize the described markets, as well as Axon's attempt to monopolize, or its actual monopolization of, the markets for described markets in the United States, including in this district.

13. Axon, Microsoft and Safariland should, therefore, have foreseen the possibility of being brought before this Court to answer for any illegal acts related to their business conducted here.

14. Axon, Microsoft and Safariland's anticompetitive conduct was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this district.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

15. Venue is proper in this district pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c).

16. Venue is proper in the United States District Court for the District of Arizona under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this district.

17. Defendants transacted business or acted through subsidiaries or agents present in this district; a substantial part of the events giving rise to Plaintiff' claims occurred in this district; and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district, including:

   a. Defendants negotiated contracts with purchasers in this district to provide products and services to municipalities in this district, which are potential competitors of GovGPT; and

   b. Defendants delivered products and services in the relevant market to purchasers in this district to provide products and services to municipalities in this district which are potential customers of GovGPT.

18. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as the federal claims.

19. In addition, this Court has general personal jurisdiction over Axon because Axon's principal place of business is in Arizona. Alternatively, this Court has specific personal jurisdiction over Axon, Microsoft, and Safariland because they purposefully

directed its advertisements or promotions at consumers in this district and caused harm to Plaintiff in this district. Defendants therefore have minimum contacts with the State of Arizona and those contacts are related to this lawsuit.

20. This Court has personal jurisdiction over Microsoft because Microsoft operates datacenters in El Mirage and Goodyear, Arizona (known as "West US 3"), part of the Greater Phoenix area in this district. These data centers are integral to Microsoft's cloud services, including storing and managing digital evidence data for Axon's Evidence.com platform. Microsoft's close strategic collusion with Axon, which involves the integration of Microsoft Azure with Axon's Evidence.com platform, has substantial effects within the District of Arizona. This relationship supports Axon's monopolistic practices, affecting the market and law enforcement operations in this district.

21. In addition, this Court has general personal jurisdiction over Microsoft because Microsoft conducts significant business activities in the District of Arizona, selling software, services, and devices, including those related to its cloud infrastructure that supports Axon's operations. Alternatively, this Court has specific personal jurisdiction over Microsoft because the anticompetitive and deceptive conduct by Axon and Microsoft, including the migration of data to Microsoft Azure and the subsequent monopolistic practices, occurred and have substantial effects within this district. Moreover, the economic harm and operational constraints caused by these practices directly impact law enforcement agencies and municipalities within the District of Arizona. Microsoft thus has minimum contacts with the State of Arizona and those

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

contacts are related to this lawsuit.

22. This Court has personal jurisdiction over Safariland because it conducts substantial business in this district, including the sale and distribution of its body-worn cameras and hosters.   In addition, this Court has general personal jurisdiction over Safariland because it entered into a sale/contract with Axon's whose principal place of business is in Arizona.

**STANDING**

Standing with respect to Plaintiff GovGPT

23. GovGPT, a startup specializing in advanced artificial intelligence solutions for law enforcement, including Body-Worn Cameras (BWCs) and Digital Evidence Management Systems, seeks to compete fairly in this market.

24. Plaintiff's DragonFly merges tactical vests with multiple body cameras on the front and the back, with AI based real time threat detection. GovGPT does not use Quectel LTE modules in its products, offers edge based artificial intelligence for threat detection (rather than cloud based), and provides local storage of inference data. In edge computing, data is processed locally on the device where it is generated, such as a camera, sensor, or tactical vest. This eliminates the need to transfer potentially sensitive data over the internet to a remote cloud server, reducing the risk of data interception or unauthorized access during transmission.

25. Plaintiff's digital evidence management system from inception of GovGPT includes its Hiago product, which enables municipalities to meet their FOIA obligations

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

while redacting private information and providing transparency to their communities using artificial intelligence. GovGPT offers digital evidence management solutions with scalable, secure, and portable storage for camera footage hosted on AWS, Microsoft, Google Cloud, private storage, or other vendors.[2] Therefore, GovGPT has standing.

## FACTUAL ALLEGATIONS

26. In February 2018, Axon migrated 20 petabytes of data from its Evidence.com platform to Microsoft Azure, significantly enhancing its data storage and management capabilities. This move laid the foundation for Axon's dominance in the digital evidence management market by leveraging Azure's scalability, security, and performance.

27. Months later, in May 2018, Axon, now established leadership because of its agreement with Microsoft, unlawfully gained monopoly power in the defined Markets by acquiring its largest and most vigorous competitor in the which include Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems market, VieVu, LLC ("VieVu"), from Safariland (the "Acquisition"). As part of the deal, Axon and Safariland further entered into various related anticompetitive agreements with each other. Among other things, these agreements prohibited Safariland from competing with Axon in the Body-Worn Cameras (BWCs) and related Digital Evidence Management

---

[2] GovGPT does not operate in the Public Safety Video Integration and Management Platforms market today. However, it has plans to. GovGPT is a potential and anticipated competitor because GovGPT's intention to compete directly with Axon on all public safety related products.

Systems markets for a decade or more. The Acquisition eliminated direct and substantial competition between Axon and VieVu, which Axon described as the "#2 competitor."

28. Axon's data migration to Azure, conducted without adequate informed consent from law enforcement agencies, established a foundation for Axon's monopolistic control over the digital evidence management market. By consolidating to a sole-sourced Microsoft's robust cloud infrastructure without choice to its law enforcement customers, Axon was able to enhance its service offerings, creating significant barriers to entry for other competitors and embedding its products deeply into the operations of police departments and municipalities.

29. Before the Acquisition, VieVu aggressively competed against Axon for the sale of Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems to police departments in the United States. This competition resulted in increased competition and provided customers with robust features and significant improvements. For example, Axon told its Board in May 2018 that the "VieVu business strategy [was to] [u]ndercut on price." *Id. ¶ 3.* VieVu also focused on improving its products in part because Axon is aggressively pushing feature set and existing customers are demanding those features. *Id.*

30. Competition between Axon and VieVu was intense. VieVu was Axon's closest and most serious competitor in the Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems markets. VieVu was successful in winning accounts

with features competitive with Axon's for several large police departments. The competition between the two rivals became especially intense after VieVu won a contract with NYPD—by far the largest municipal police department in the country—with a bid that was 62% lower than Axon's. VieVu's former General Manager acknowledged that "[w]e started a price war." *Id.* ¶ *5*. Axon's CEO testified that after losing the contract, Axon made an offer of 1,000 free BWCs to New York City. Axon eventually expanded its promotion on or around April 5, 2017, when it offered free Body-Worn Cameras (BWCs) for one year to every police agency in the United States. Axon's CEO also admitted that part of its reason for acquiring VieVu was to obtain the huge NYPD account.

31. After, and due to the Acquisition, it became more difficult for competitors to compete. The strategic partnership with Microsoft set forth a series of events and actions including the VieVu acquisition that not only consolidated Axon's market power but also played a critical role in maintaining Axon and Microsoft's dominance, directly affecting competitors across the United States in breaking into a consolidated market. The ability for startups to compete with Axon is impeded because Microsoft cannot practically allow law enforcement agencies and municipalities to port their data to other platforms without rendering their entire digital evidence management and body-worn camera investment toothless, as their Axon cameras, Tasers, and Axon Fleet 3 cams would fail to function if this were to happen.

32. In April 2023, Axon announced the Axon Body 4 camera, which rapidly became

its fastest-selling body camera product.[3] More than 100,000 units were shipped in the second half of 2023, primarily to U.S. police departments. *Id.* Unlike its predecessor, the Axon Body 3, Axon admits that Body 4 includes Quectel modules.[4]

33. On February 1, 2024, Axon acquired Fusus, a provider of real-time crime center (RTCC) technology. In 2022, prior to the Axon acquisition, surveillance research firm IPVM that Fusus had helped network more than 33,000 individual cameras in over 2,400 distinct locations around the U.S.[5] By acquiring Fusus, which integrates video feeds from a wide variety of public and private sources (such as fixed surveillance cameras, drones, and other devices), Axon consolidated control over both the acquisition and the management of real-time video data. This vertical integration gives Axon a greater monopoly over the entire spectrum of evidence collection and management, limiting competitors' like GovGPT's ability to offer similar, comprehensive services.

34. In a podcast interview in March for Business Radio, Fusus by Axon's division CEO Chris Lindenau said the goal of the company was to build New York-style surveillance systems for thousands of smaller police departments around the U.S.[6] With

---

[3] Axon Enterprise, Inc., Investor Relations, *Press Release*, Feb. 27, 2024, available at https://investor.axon.com/2024-02-27-Axon-2023-Revenue-Grows-31-to-1-56-Billion.

[4] MacDonald, David, *Declaration of David MacDonald*, Principal Security Engineer at Axon, ECF 24-1. Case No.: 2CV-24-01869-PHX-SMB

[5] Context News, *Privacy or Safety? U.S. Brings Surveillance City to the Suburbs*, CONTEXT (May 31, 2023), https://www.context.news/digital-rights/privacy-or-safety-us-brings-surveillance-city-to-the-suburbs.

[6] Simons, S. (Host). F*usus - Public Safety & Crime Solving Technology* [Audio podcast episode]. In Simon Says (Business RadioX), March 23, 2023 https://businessradiox.com/podcast/simonsays/fusus/

annual subscription fees starting under $20,000 Fusus provides cities with what it calls a "real-time crime center in the cloud", while New York's system cost as much as $40 million to set up, according to local media.[7]

35. The acquisition of Fusus expanded Axon's real time operations Total Addressable Market ("TAM") by $13 billion, bringing the total to $16 billion.[8] In addition, Fusus nearly doubled Axon enterprise opportunity, adding $7 billion to this TAM, and added approximately $6 billion more of addressable opportunity in state, local, and international markets. *Id.* In total, Fusus added about $26 billion to Axon's total TAM.

36. Axon's corporate CEO Rick Smith highlighted the alignment between Fusus and the Body 4 category, emphasizing that the acquisition supports Axon's long-term growth and market control. *Id.* By adding Fusus' capabilities, it becomes even more difficult for startups like GovGPT to compete with Axon's bundled pricing for a suite of services for both real-time surveillance and long-term evidence storage. *Id.* The Electronic Frontier Foundation has been collecting and reviewing documents about cities' uses of Fusus, which counts nearly 150 jurisdictions as customers, including many major police departments across the United States.[9]

---

[7]. Gothamist, *Inside the NYPD's new Domain Awareness surveillance HQ.* Gothamist. https://gothamist.com/news/photos-inside-the-nypds-new-domain-awareness-surveillance-hq (date unknown).

[8] Axon Enterprise, Inc., Investor Relations, *Press Release*, Feb. 27, 2024, available at https://investor.axon.com/2024-02-27-Axon-2023-Revenue-Grows-31-to-1-56-Billion.

[9] Electronic Frontier Foundation, *Neighborhood Watch Out: Cops Are Incorporating Private Cameras into Their Real-Time Surveillance Networks*, EFF (May 11, 2023), https://www.eff.org/deeplinks/2023/05/neighborhood-watch-out-cops-are-incorporating-private-cameras-their-real-time.

37. This lock-in effect consolidates Axon's dominance, because competitors like GovGPT which desires to expand to Public Safety Video Integration and Management Platforms market are at a disadvantage because Axon can bundle its products (Axon Body 4 cameras, digital evidence management, and public safety video integration and management platforms) together, creating cost efficiencies that smaller or specialized competitors cannot match, and creating integrations that competitors like GovGPT cannot offer.

38. GovGPT finds competing even more difficult because Axon's agreements with law enforcement agencies often include exclusivity clauses, tying the purchase of body-worn cameras and visibility in Fusus to the mandatory use of Evidence.com, effectively foreclosing competition from startups like GovGPT. Axon's pricing strategies and contract terms are designed to create significant switching costs for law enforcement agencies, further entrenching its monopoly and preventing agencies from considering alternative solutions. For example, in Axon's May 2024 contract with Pasadena California is for a five year term in which there is bundling of body worn cameras, tasers, and mandatory evidence management software.[10]

39. Similarly, in December 2022, the County of Santa Clara entered into a contract

---

[10] City of Pasadena Agenda Report. (2024, May 6). Authorization to Enter into a New Contract with Axon Enterprise, Inc. for Five (5) Years Not-to-Exceed $4,506,601 to Consolidate Current Body Worn Camera and Taser Product Agreements, Add Three (3) New Axon Products and Upgrade Body Worn Camera and Taser Devices. Retrieved from City of Pasadena: https://ww2.cityofpasadena.net/2024%20Agendas/May_06_24/AR%2015.pdf

with Axon for a period of five-years for approximately $16 million to provide body-worn cameras, mandatory evidence management system, and related services.[11] More recently, these agreements are being bundled with Fusus. For example, on August 20, 2024, the city of Wilmington North Carolina entered into a five year agreement with Axon bundling real time streaming from dashcams, mandatory evidence management, and Fusus.[12]

    40. In June 2022, Axon signed an exclusive extension agreement with Microsoft for a six-year term to exclusively require its Evidence.com platform to work on Microsoft Azure. As of August 2024, over 2 billion evidence files have been loaded into Axon Evidence and Microsoft Azure cloud stores more than 400 petabytes of data, which is among the largest public repositories of public data on Microsoft Azure and anywhere in the world.[13] Microsoft has been known to offer better pricing and incentives, like cloud credits, to entice companies to move more data to Azure. Microsoft's preferential

---

[11] Santa Clara County Board of Supervisors. "*Authorization to Enter into an Agreement with Axon Enterprise, Inc.*" Agenda Report No. 121439, May 21, 2024, https://sccgov.iqm2.com/Citizens/Detail_LegiFile.aspx?ID=121439.

[12] City of Wilmington, Agenda Report. "*Amendment to the Contract with Axon Enterprise, Inc. for Body-Worn Cameras and Related Services.*" August 20, 2024, https://wilmington.granicus.com/DocumentViewer.php?file=wilmington_0f35deb91b84a1f84b6588fd6da30af4.pdf&view=1.

[13] Axon Reports Q2 2024 Revenue of $504 Million, Up 35% Year-Over-Year, Raises Outlook." August 6, 2024, https://investor.axon.com/2024-08-06-Axon-reports-Q2-2024-revenue-of-504-million,-up-35-year-over-year,-raises-outlook.

pricing strategy, such as offering $500 million in Azure credits exclusively to OpenAI, gives preferential pricing or better terms to select partners. Upon information and belief, this preferential pricing was extended to Axon.

41. Axon's exclusive extension agreement with Microsoft in 2022, which requires its Evidence.com platform to work exclusively with Microsoft Azure, reinforces competitive barriers by concentrating vast amounts of data (over 400 petabytes) in one platform. This massive, exclusive data repository reduces the ability of competitors, like GovGPT, to recruit police departments to port data on alternative cloud solutions so that GovGPT can assist them in building fine tuned threat detection models, effectively monopolizing the market for public safety body cameras, data storage and management. It hinders the entry of new competitors and limits competition by forcing reliance on Microsoft's cloud services, making the market more difficult for emerging players like GovGPT to compete and convince police departments to port their data to providers where GovGPT can offer AI services.

42. This exclusivity further entrenching Microsoft's dominance in the cloud computing market and Axon's control over body cameras and public safety evidence management systems. On Axon's website, the company states that OpenAI's GPT-4 Turbo model powers its Draft One transcription system, but it has been fine-tuned to avoid speculative or creative embellishments, focusing strictly on factual transcriptions for law enforcement reports.[14] When the agreement with Axon was made in February

---

[14] Axon Enterprise, Inc. "Draft One." 2024, https://www.axon.com/products/draft-one.

2022, Microsoft had not yet recouped its cash and credit investment in OpenAI as ChatGPT 3 had not yet launched yet.[15]

43. Axon boasts that its agreement with Microsoft provides long-term pricing certainty and cost visibility for its cloud services, which are critical for its body-worn cameras and digital evidence management systems.[16] Axon admitted in August 2022 that this agreement with Microsoft is to maintain exceptional profit margins, over 80%, and offer pricing predictability to its customers.[17]

44. Microsoft, through its renewed 2022 partnership with Axon Enterprise, Inc., continues to amass exclusive access to an extensive repository of body camera footage hosted on its Azure cloud platform. This footage is generated from Axon's body-worn cameras used by law enforcement agencies across the United States, which is by definition public data (with automated AI redaction for privacy and personally identifiable information). This public data hosted by Microsoft includes vast amounts of first person view footage that is difficult for competitors like GovGPT to convince police departments to move to competing providers so that GovGPT can assist in fine tuning AI models.

---

[15] Heaven, Will Douglas. *The Inside Story of How ChatGPT Was Built from the People Who Made It.* MIT Technology Review, 3 Mar. 2023, https://www.technologyreview.com/2023/03/03/1069311/inside-story-oral-history-how-chatgpt-built-openai/.
[16] Axon Q2 2022 Shareholder Letter. August 2022, https://investor.axon.com/quarterly-results.
[17] Q2 2022 Earnings Transcript. August 2022, https://investor.axon.com/quarterly-results.

45. Microsoft first invested $1 billion in OpenAI in 2019[18], and among its terms it described that Microsoft and OpenAI will jointly build new Azure AI supercomputing technologies. *Id.* In addition, terms included that OpenAI will port its services to run on Microsoft Azure through approximately $500 million dollars of computing credits in Azure offered exclusively to OpenAI.[19] The preferential pricing arrangement—specifically, the $500 million in Azure computing credits offered exclusively to OpenAI by Microsoft—is anticompetitive and harmful to the market by creating barriers to entry for other competitors. *Id.* This exclusive deal not only solidifies Microsoft's control over the cloud computing infrastructure supporting AI but also limits access to similar pricing for other potential competitors.

46. Then in January 2023, Microsoft invested another $10 billion.[20] In total, Microsoft's investment in OpenAI is reportedly worth up to $13 billion.[21]

---

[18] *OpenAI Forms Exclusive Computing Partnership with Microsoft to Build New Azure AI Supercomputing Technologies*, Microsoft News (July 22, 2019), https://news.microsoft.com/2019/07/22/openai-forms-exclusive-computing-partnership-with-microsoft-to-build-new-azure-ai-supercomputing-technologies/.

[19] Kyle Wiggers, *Microsoft Invests Billions More Dollars in OpenAI*, Extends Partnership, TechCrunch (Jan. 23, 2023), https://techcrunch.com/2023/01/23/microsoft-invests-billions-more-dollars-in-openai-extends-partnership/ .

[20] *Microsoft Confirms Its $10 Billion Investment into ChatGPT, Changing How Microsoft Competes with Google, Apple, and Other Tech Giants*, Forbes (Jan. 27, 2023), https://www.forbes.com/sites/qai/2023/01/27/microsoft-confirms-its-10-billion-investment-into-chatgpt-changing-how-microsoft-competes-with-google-apple-and-other-tech-giants/.

[21] Alexandra Garfinkle, *Microsoft's near-term fate is in OpenAI's hands — for better or worse*, Yahoo! Finance (Dec. 20, 2023), https://finance.yahoo.com/news/microsofts-near-term-fate-is-in-openais-hands--for-better

47. In March 2024, OpenAI's interim CEO, Mira Murati, confirmed to the *Wall Street Journal* that OpenAI's models, including GPT-4, were trained using publicly available data and licensed sources.[22]  Therefore, police departments must rely on Axon and Microsoft to build AI models because switching providers  would mean that their Axon body cameras would no longer function.

48. Axon's use of OpenAI's GPT-4 model for its Draft One transcription service indicates a close relationship between Axon and the OpenAI-Microsoft ecosystem. Since Microsoft built the supercomputer on Azure that trained OpenAI's models, and Axon stores much of its body camera data on Azure, this collaboration creates a nexus where Axon is deeply embedded in Microsoft's infrastructure. This interconnectedness is evidence of collusion or anti-competitive practices designed to dominate the digital evidence management market by controlling the key AI tools and cloud services used to process and manage that data.

49. In May 2024, Microsoft CEO Satya Nadella wrote that "It all starts with our strategic partnership with OpenAI. As OpenAI innovates, our promise is that we will bring all that innovation to Azure, too."[23]  These statements imply that Microsoft has a

---

-or-worse-205250812.html?fr%3Dsycsrp_catchall&sa=D&source=docs&ust=172660203
6246233&usg=AOvVaw2ejGYlRaQ6XehJ69OClDrh&guccounter=1.

[22] *OpenAI CTO Sora on Generative Video: An Interview. The Wall Street Journal*, March 13, 2024,
https://www.wsj.com/tech/personal-tech/openai-cto-sora-generative-video-interview-b66320bb.

[23] Nadella, Satya. "The Age of AI Transformation." LinkedIn Pulse, May 22, 2024,
https://www.linkedin.com/pulse/age-ai-transformation-satya-nadella-soocc.

privileged position to benefit from OpenAI's innovations, creating a pipeline of AI advancements that are directly embedded into Azure. By the time the extension agreement was signed in 2022, Micoroft had not yet recouped gains from the investment in OpenAI, upon information and belief. Since the 2022 extension agreement, Microsoft stock has risen over 50%.



[24]

50. GovGPT, in an effort to compete in the AI and public safety technology markets, sought access to similar body camera footage from 30 of the top law enforcement agencies across the United States through state level FOIA like open records statutes. However, GovGPT was informed in many cases that access to this footage would

---

[24] *Stock Chart* generated by Google on September 22, 2024 at 10 pm PST.

require a court order, requires physical presence in that state by the requestor, and any granted access would be narrowly tailored and limited to specific requests. The difficulty in accessing this publicly-generated data created significant barriers for GovGPT and other competitors, preventing them from utilizing this critical dataset to develop competitive AI models.

51. On September 13, 2024, Axon's Mike Shore, Senior VP and General Manager of Axon posted the company's efforts to enter into language translation inference space through the cloud, in direct competition with GovGPT.



Friday 5:39 PM

Mike Shore on LinkedIn: AI-enabled demo demonstrating real-time translation through an Ax...
linkedin.com

52. Mr.Shore deleted this video from LinkedIn the next day on September 14, 2024 after Plaintiff's representatives saw his post, and he became aware of this based on his viewing of GovGPT's counsel's profile on LinkedIn.[25]

---

[25] Shore, Mike B. "Recent Activity." LinkedIn, www.linkedin.com/in/mikebshore/recent-activity/all/. Accessed Sept. 22, 2024.

**AXON INTENTIONALLY CONCEALS DISCLOSURE OF QUECTEL**

**MODULES FROM ITS CUSTOMERS**

53. Cellular IoT (Internet of Things) modules like the Quectel EG065K module in Axon Body 4s are hardware components that enable body cameras to connect to the internet using cellular networks like 4G LTE.[26] These modules function similarly to the modem in a smartphone, providing wireless communication capabilities that allow devices to send and receive data over the cellular network. *Id.*

54. Quectel cellular IoT modules in Axon Body 4 encapsulate a Qualcomm chip, in addition to other chips and/or components, made by unknown entities. *Id.* The security of the entire module must be considered holistically, as weaknesses in any part of the module's design or implementation can undermine the protections offered by the Qualcomm chip itself. *Id.* Certain manufacturers, particularly those subject to foreign government influence (such as Quectel), may intentionally or unintentionally include backdoors or insecure features in their modules. *Id.* These backdoors can allow remote control of the devices without user consent. *Id.* Even though Qualcomm chips may be secure, the overall security of the module depends on the integrity of the manufacturer's design and production processes. *Id.*

55. Particularly, cellular IoT modules including those by Quectel rely on firmware to

---

[26] Charles Parton, *Cellular IoT Paper*, with significant technical expertise provided by Dr. Samantha Hoffman, OODA Loop (Feb. 2023), https://www.oodaloop.com/wp-content/uploads/2023/02/Cellular_IoT_Paper_JAN_Master_PDF.pdf.

manage their operations, including network connectivity, data transmission, and device control.[27] If this firmware contains vulnerabilities—such as insecure coding practices, backdoors, or outdated protocols—it can be exploited by attackers to gain unauthorized access to the device, regardless of the security features of a Qualcomm chip they may encapsulate. *Id.*

56. On September 19, 2024, Israel (or other foreign actors) used a cellular connection to detonate thousands of People's Republic of China manufactured pagers, walkie-talkies and connected devices hundreds of miles away in Lebanon, killing dozens of people and maiming thousands others including children." *Id.*

57. On September 18, 2024, the United States and allied countries said they had taken control of a network of 260,000 internet-connected cameras, routers and other devices.[28] The FBI said the Chinese government had been using consumer devices connected to the Internet (many with cellular IoT modules) to spy on sensitive organizations and regular American citizens in their homes, with 75% of infected devices located in homes and

---

[27] *Gallagher and Krishnamoorthi Urge Administration to Blacklist Quectel as a 'Chinese Military Company'*, SELECT COMMITTEE ON THE CCP, (Jan. 4, 2024), (last viewed September 22, 2024), https://selectcommitteeontheccp.house.gov/media/press-releases/gallagher-krishnamoorthi-urge-administration-blacklist-quectel-chinese

[28] United States Department of Justice, Office of Public Affairs, *Court-Authorized Operation Disrupts Worldwide Botnet Used by People's Republic of China State-Sponsored Cyber Actors* (Sept. 22, 2024), available at https://www.justice.gov/opa/pr/court-authorized-operation-disrupts-worldwide-botnet-used-peoples-republic-china-state.

offices mostly in North America.[29]  The massive China-state IoT botnet went undetected for over four years from 2019 to 2024. *Id.*

58. Many of the devices that China used in this attack have Quectel modules, such as MikroTik modems/routers, whose datasheet specifies its use of Quectel modules.[30] Some of MikroTik routers are even co-developed by Quectel.[31]  Therefore, upon information and belief, Quectel modules in devices such as those FBI had identified were gateways to espionage from the Chinese government.[32]

59. That same day, FBI Director Christopher A. Wray stated that "This was another successful disruption, but make no mistake, it's just one round in a much longer fight" and that "The Chinese government is going to continue to target your organizations and our critical infrastructure either by their own hand or concealed through their proxies." *Id.*

60. Axon has previously demonstrated awareness of security vulnerabilities

---

[29] Ars Technica, *Massive China-state IoT botnet went undetected for four years—until now,* Sept. 18, 2024, available at https://arstechnica.com/security/2024/09/massive-china-state-iot-botnet-went-undetected-for-four-years-until-now/.

[30] Ars Technica, *Massive China-state IoT botnet went undetected for four years—until now,* Sept. 18, 2024, available at https://arstechnica.com/security/2024/09/massive-china-state-iot-botnet-went-undetected-for-four-years-until-now/.

[31] TimesTech, "*LMT and MikroTik Jointly Developed LTE18 Router for Quectel's EG18,*" TimesTech.in, available at: https://timestech.in/lmt-and-mikrotik-jointly-developed-lte18-router-for-quectels-eg18/, Sept. 20, 2020.

[32] MikroTik Wiki, "*Cellular Quectel Modems 01,*" MikroTik, available at: https://wiki.mikrotik.com/wiki/Cellular_Quectel_modems_01.

associated with devices utilizing cellular IoT modules.[33] Specifically, Axon reported a security vulnerability known as "Devil's Ivy" in certain Axis IP-based cameras used in their Axon Interview deployments, as detailed in their security advisory Axon-1702. *Id.* This flaw could allow attackers to disrupt camera operations or gain unauthorized access, posing significant risks to the integrity and security of law enforcement equipment. *Id.*

61. However, when similar risks were present in Axon's own products—namely, the Axon Body 4 cameras equipped with cellular IoT modules from a supplier (Quectel) identified by the U.S. Congress this year as a Chinese military company—Axon chose to conceal this information. Despite their prior acknowledgment of such vulnerabilities in partner devices, Axon did not disclose the potential security threats inherent in their own equipment. This inconsistency indicates that Axon was aware of the risks but deliberately withheld this critical information when it concerned their products, demonstrating knowledge and intent to obscure potential security flaws from customers and the public.

62. On September 13, 2024, FBI Director Christopher Wray emphasized that no country poses a greater threat to U.S. innovation, economic, and national security than China.[34] He highlighted that China has the world's largest hacking program, outpacing

---

[33] Axon, "*Security Advisory: AXON-1702*," Axon, available at: https://www.axon.com/security/advisory-axon-1702.

[34] ABC News Nightline, *Oprah Winfrey Explores the Future of AI Technology*, (Sept. 13 2024),

all other nations combined, and has stolen more personal and corporate data from Americans than any other country. *Id.* Mr. Wray explained that the Chinese government's hacking capabilities are so vast that, even if the FBI focused solely on China, they would still be outnumbered 50 to 1. *Id.* This scale underscores the competitive race the U.S. faces in maintaining cybersecurity. *Id.*

63. On September 11, 2024, the U.S. House of Representatives passed the DJI Drone ban for a second time, driven by national security concerns raised by multiple U.S. government agencies regarding DJI's national security risks for allegedly sharing sensitive data with the Chinese Communist Party (CCP).[35] A primary technical reason for the ban is because of a Quectel cellular IoT module in DJI's Mavic drones that enabled this alleged sharing to occur.[36] Quectel is an industry alliance partner with DJI. *Id.*

64. **Every Axon Body 4 camera includes a Chinese Quectel EG065K cellular IoT module capable of the sort of espionage FBI Director Christopher Wray and the**

---

[https://abcnews.go.com/Nightline/video/oprah-winfrey-explores-future-ai-technology-113654082](https://abcnews.go.com/Nightline/video/oprah-winfrey-explores-future-ai-technology-113654082),

[35] House Passes Countering CCP Drones Act, DroneLife (Sept. 10, 2024), [https://dronelife.com/2024/09/10/house-passes-countering-ccp-drones-act/](https://dronelife.com/2024/09/10/house-passes-countering-ccp-drones-act/) ("Chairman John Moolenaar of the House Select Committee on the Chinese Communist Party stated, "DJI poses a real national security risk to the U.S. given its deep partnership with the Chinese military, its expressed allegiance to the Chinese Communist Party, and its surveillance technology operating across U.S. soil."").

[36] Charles Parton, *Cellular IoT Paper*, with significant technical expertise provided by Dr. Samantha Hoffman, OODA Loop (Feb. 2023), [https://www.oodaloop.com/wp-content/uploads/2023/02/Cellular_IoT_Paper_JAN_Master_PDF.pdf](https://www.oodaloop.com/wp-content/uploads/2023/02/Cellular_IoT_Paper_JAN_Master_PDF.pdf).

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

**U.S. House of Representatives describes, and in the same manner as described by Congress using DJI drones.**[37]

65. Quectel EG065K modules inside Axon Body 4 cameras pose a greater threat than DJI based on its deep integration into Axon Body 4, and Axon's failure to disclose these risks are contrary to its advertisements that "We maintain transparency and operate equitably" and that there is "ethical rigor behind how we design."[38]  Officers wear Axon Body 4 devices containing Quectel EG065K modules, capturing sensitive interactions and data, and are integral to public safety operations. Unlike DJI drones, which may be used in limited or controlled settings, Axon's body cameras are deployed across thousands of law enforcement agencies, creating a far-reaching risk of data exposure.

66. Yet, Axon has never warned any police department, municipality, or the public taxpayer about it.  There is not even a single mention of Quectel on Axon's website. Instead, Axon intentionally conceals disclosure of these risks from the public, shareholders and from taxpayers to unfairly compete against competitors including GovGPT.  These LTE Quectel EG065K modules enable the Axon 4 camera to stream video, audio, GPS location directly from the body camera to a remote location using cellular communications.[39] This feature, intended to allow real-time streaming of video,

---

[37] While Plaintiff has confirmed the presence of Quectel modules in Axon Body 4 cameras, it is possible that discovery will reveal that other Axon products including Axon Body Workforce retail body worn cameras and Axon dashcams contain this and other Quectel modules.

[38] https://www.axon.com/responsibility#, last viewed Sept. 22, 2024.

[39] *Chinese Cellular (IoT) Modules: Countering the Threat, March 2024 Report*, Coalition for a Secure Technology (Mar. 2024),

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

GPS location and audio to police headquarters, can be exploited to stream data to unauthorized locations using access privileges, for data harvesting, collecting and monitoring of data, and espionage by the Chinese Communist Party ("CCP").[40]

67. Instead of taking ownership of the problem, Axon has referenced declarations from Quectel employees including Quectel's Senior 5G Product Manager Mike Chong Zhou. Mr. Zhou holds a Ph.D. from Shanghai Jiaotong University[41], the same institution where Patrick Qian, Quectel's founder and CEO, also graduated.[42] The Shanghai Jiao Tong University is designated high risk for its high level in defense research and alleged links to cyber attacks.[43] The university's cybersecurity degree program is located on a People's Liberation Army information engineering base in Shanghai.[44]

68. Prior to joining Quectel in May 2023, Mr. Zhou was the Chief Engineer of ZTE R&D Center in Shanghai, China from May 2002 to September 2010 and later the General Manager and Vice President of ZTE Oversea Branch in the United States for

https://cim-coalition.co.uk/new-report-published-by-the-coalition-on-secure-technology-warns-chinese-internet-of-things-modules-must-be-banned-from-our-critical-national-infrastructure/.
[40]Charles Parton, *Chinese Cellular (IoT) Modules: Countering the Threat*, Geostrategy Programme Policy Paper No. GSPPP02, Mar. 2024, https://www.geostrategy.org.uk/app/uploads/2024/03/GSPPP02.pdf.
[41] Mike Chong Zhou, LinkedIn, https://www.linkedin.com/in/mikeczhou/.
[42] Patrick Qian, LinkedIn, https://www.linkedin.com/in/patrick-qian-81774827/.
[43] Shanghai Jiaotong University, Australian Strategic Policy Institute, https://unitracker.aspi.org.au/universities/shanghai-jiaotong-university/ (last visited Sept. 15, 2024) and
[44] Dakota Cary, *Testimony before the U.S.-China Economic and Security Review Commission*, Georgetown University Center for Security and Emerging Technology, https://cset.georgetown.edu/wp-content/uploads/Testimony-before-U.S.-China-Economic-and-Security-Review-Commission-Dakota-Cary.pdf (February 17, 2022).

nearly twelve years from until March 2022.[45]

69. During Mr. Zhou's tenure in leadership roles at ZTE, the United States through the Federal Communications Commission designated ZTE as a national security threat and banned its use from the United States on June 30, 2020.[46] The founder of Mr. Zhou's former employer ZTE, Qian Penghe, is also one of the main private shareholders in Quectel.[47] There is regular interchange of employees. *Id.* They are members of many of the same alliances including the 5G Terminal Innovation Joint R&D Centre.[48] To circumvent American regulation, Quectel supplies components to ASR Microelectronics which in turn is a key supplier to ZTE. *Id.*

70. **Yet, Axon attaches a declaration from Mr. Zhou to justify its conduct of concealing information from the public in ECF filings in this case.** (ECF 54-1).

71. Like phones, Axon Body 4 devices can be updated over the air through "firmware" updates. Firmware is the low-level software that controls a device's hardware. It acts as an interface between the hardware and the higher-level software (e.g., an operating system or application). Mr. Zhou has admitted to the Plaintiff Mr.

---

[45] Zhou, Mike. LinkedIn. Available at: https://www.linkedin.com/in/mikeczhou/.

[46] Federal Communications Commission. (2020, June 30). Public notice: DA 20-691A1. https://docs.fcc.gov/public/attachments/DA-20-691A1.pdf.

[47] Charles Parton, *Cellular IoT Paper*, with significant technical expertise provided by Dr. Samantha Hoffman, OODA Loop (Feb. 2023), https://www.oodaloop.com/wp-content/uploads/2023/02/Cellular_IoT_Paper_JAN_Master_PDF.pdf.

[48] *News Article*, China Unicom, http://webcache.googleusercontent.com/search?q=cache:U5xxntYRyzQJ:www.chinaunicom.com.cn/news/201904/1556087354374160355.html (cached as of Sept. 15, 2024).

Abhyanker that Quectel EG065K modules can be updated over the air but the only thing that prevents them from doing so is without the consent of its customers. Zhou admitted that the firmware updates are provided by Quectel about every six months to fix bugs. Quectel also admitted that the firmware updates are provided from Quectel from its global R&D Centers, the majority of which are located in China. Also, Zhou acknowledges that while Quectel itself does not directly perform firmware updates over the air (OTA) without permission, he confirms that **Quectel has the ability to do so** with the customer's consent and this limitation is based on private agreement. He specifically states:

> "Majority is right. But we don't do... we didn't do module firmware updates. You know, if the module is sold to our customers, we would not do any firmware updates over the air. You know, directly it would... it would [be] done by... it will be done by our customers like you, you would do that. You know, we support you to do it, but we would not do... do that about ourselves, to upgrade your device... without your permission, to do.
>
> *Q: I see, okay, so that'll be in the Statement of Work. That'll be in the policies and things. Is that? How that secured?*
>
> Yes, yes, that's, that's, that's the common practice" [*sic*]

Listen to audio clip with context here.[49]

72. This admission is critical because it confirms that **Quectel can support or enable remote firmware updates**, which creates a backdoor to Axon Body 4 cameras that could be exploited by the Chinese Communist Party ("CCP") and Military on

---

[49] The undersigned attests this a true and correct copy of a snippet audio of an audio recording with Quectel between minutes 47 and 49 on Tuesday August 20, 2024

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

demand. If an attacker in China gains control of the OTA update mechanism (e.g. through password access or Chinese cyberhacking), they install malicious firmware, giving them control over the device. The CCP with access can use OTA updates to install backdoors, allowing persistent access to the device even after a security issue has been fixed. The CCP with access can intercept and alter the firmware update before it reaches the device, and trick a device into downloading and installing fake firmware by spoofing the update server or by delivering an unauthorized update.

73. Mr. Zhou confirms that Quectel has technical ability to do this, and all that stands in the way is access privileges (which can be hacked) or permission from Axon or a directive from the CCP as outlined in Quectel's terms.[50] Trusting the manufacturer of the Cellular IoT module, such as Quectel or similar companies, is critical in light of the risks associated with firmware updates and OTA (Over-the-Air) communication because these modules play a fundamental role in securing communication and managing data between edge devices and the cloud.

74. Moreover, Quectel supports customers in performing firmware updates. This acknowledgment means that Quectel has the technical capability and knowledge to enable or facilitate remote firmware updates, even if they are initiated by the customer. The distinction Zhou tries to make—that Quectel does not directly push updates—does

---

[50] *Privacy Policy*, Quectel Forums, https://forumschinese.quectel.com/privacy (last visited Sept. 15, 2024).

not mitigate the fact that Quectel can create the means for firmware updates to be deployed remotely, posing the same security risks.

75. Zhou's attempt to distance Quectel from directly performing firmware updates overlooks the fact that Quectel controls the firmware and provides the tools and processes for its deployment. Whether or not Quectel initiates the updates, it still plays a critical role in enabling customers to push firmware updates remotely. By doing so, Quectel effectively creates a potential backdoor that could be exploited by the CCP. The very fact that Quectel supports the update process heightens the risk of compromise, especially when this capability could be leveraged without the customer's knowledge or consent when demanded by the CCP under Chinese law.

76. The fact that this capability exists introduces significant risks for the security of Axon Body 4 devices for espionage from the CCP, given sensitive locations and political events where law enforcement officers operate.  Given Quectel's close ties to the CCP, at a minimum Axon has a duty to warn about the inherent risks.

77. Moreover, this year, the U.S. Congress and the Federal Communications Commission have written opinion letters to blacklist Quectel Wireless Solutions due to its ties to the Chinese government and its role in China's civil-military fusion strategy.[51]

---

[51]*Gallagher and Krishnamoorthi Urge Administration to Blacklist Quectel as a 'Chinese Military Company'*, SELECT COMMITTEE ON THE CCP,  (Jan. 4, 2024), (last viewed Sept. 22, 2024),
https://selectcommitteeontheccp.house.gov/media/press-releases/gallagher-krishnamoorthi-urge-administration-blacklist-quectel-chinese

78. Specifically, FCC Chairwoman Jessica Rosenworcel had warned U.S. government agencies in September 2023 about the unacceptable national security risk posed by equipment incorporating Quectel modules.[52]  A few months later; on January 3, 2024, Chairman Mike Gallagher and Ranking Congress Member Raja Krishnamoorthi wrote to Secretaries Lloyd Austin and Janet Yellen, urging them to blacklist Quectel Wireless Solutions due to its ties to the Chinese government and its role in China's civil-military fusion strategy.[53]  They highlighted concerns about the security risks posed by Quectel's IoT modules in American devices.

79. On January 31, 2024, FBI Director Christopher Wray testified before the House Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party. He described the Chinese Communist Party (CCP) as a defining threat to U.S. national and economic security. Wray highlighted the CCP's cyber activities, including targeting critical U.S. infrastructure and engaging in economic espionage.[54]

---

[52] David Shepardson, *US FCC Chair Says China's Quectel, Fibocom May Pose National Security Risks*, REUTERS, (Sept. 7, 2023), (last viewed Sept. 22, 2024), https://www.reuters.com/technology/us-fcc-chair-asks-agencies-consider-restrictions-quectel-fibocom-2023-09-06/.

[53]*Gallagher and Krishnamoorthi Urge Administration to Blacklist Quectel as a 'Chinese Military Company'*, SELECT COMMITTEE ON THE CCP,  (Jan. 4, 2024), (last viewed Sept. 22, 2024), https://selectcommitteeontheccp.house.gov/media/press-releases/gallagher-krishnamoorthi-urge-administration-blacklist-quectel-chinese

[54]Wray, Christopher. "*Director Wray's Opening Statement to the House Select Committee on the Chinese Communist Party.*" Federal Bureau of Investigation, 20 Sep. 2023, https://www.fbi.gov/news/speeches/director-wrays-opening-statement-to-the-house-select-committee-on-the-chinese-communist-party,

80. The connections between Quectel and the Chinese communist party are extensive.[55]   Quectel, like all other Chinese companies, is bound by China's national security laws. Recent state security laws, such as the 2017 Intelligence Law, have not changed the longstanding de facto practice of state power in the PRC, but have further codified the expectation that in the PRC everyone is responsible for state security.[56]

81. A Quectel privacy policy, for example, states the company does not share, transfer and publicly disclose personal data unless relevant laws oblige them to do so. It specifically lists as examples laws state security and national defense, public safety, public health and major public interest, criminal investigation.[57]   Beyond these general risks of exposure to the Chinese party-state's demands, which apply to all PRC companies, Quectel has links to other PRC companies that are suppliers for PRC IoT devices.   The chart provides a clear, visual representation of how Quectel is intricately linked to the CCP. [58]

---

[55]  Charles Parton, *Cellular IoT Paper*, with significant technical expertise provided by Dr. Samantha Hoffman, OODA Loop (Feb. 2023), https://www.oodaloop.com/wp-content/uploads/2023/02/Cellular_IoT_Paper_JAN_Master_PDF.pdf.

[56]  *Privacy Policies: Mapping China's Tech Giants—Thematic Snapshot*, Australian Strategic Policy Institute (May 2021), https://www.aspi.org.au/report/mapping-chinas-tech-giants-supply-chains-and-global-data-collection-ecosystem.

[57]  *Privacy Policy*, Quectel Forums, https://forumschinese.quectel.com/privacy (last visited Sept. 15, 2024).

[58]  Charles Parton, *Cellular IoT Paper*, with significant technical expertise provided by Dr. Samantha Hoffman, OODA Loop (Feb. 2023), https://www.oodaloop.com/wp-content/uploads/2023/02/Cellular_IoT_Paper_JAN_Master_PDF.pdf.



82. Therefore, the use of Axon Body 4 cameras equipped with the Quectel EG065K module at the U.S. Capitol, at political events, at jails, in criminal investigation scenarios, and more create potential for real-time surveillance and GPS tracking at sensitive locations by the CCP and could compromise the security of the United States.

83. On May 30, 2024, Axon senior management met with GovGPT senior leadership

1   through a video call.

2   84. During the call, GovGPT urged Axon to redesign their products without Quectel
3
4   components and to notify police departments across the United States about the risks
5   associated with Quectel EG065K module in Axon Body 4 products.

6   85. Instead of listening and showing proactiveness to make changes, GovGPT's good
7
8   faith warnings were brushed aside and shortly thereafter Henrik Kuhl ended the call,
9   saying "it is not the conversation we want to have" and that GovGPT should instead
10
11  "focus on building your product and raising the capital you need."  Appalled by the
12  callousness of Axon's disregard for warning of security risks, GovGPT changed its
13
14  business model to directly compete with Axon by enabling the 360 degree recording and
15  storage capability of its DragonFly vests and tying it to the Hiago evidence management
16  and AI software.

17  86. Axon had multiple opportunities after the meeting with GovGPT in May 2024 to
18
19  correct the omission and notify its customers about the risks associated with the Quectel
20  EG065K module. These opportunities span several months leading up to the filing of the
21
22  complaint. During this period, Axon could have proactively issued a formal notification
23  to its existing customer base about the Quectel EG065K module in the Body 4 cameras
24  and the associated security risks. This would have allowed customers to make informed
25
26  decisions about their continued use of Axon's products.

27  87. Moreover, Axon could have updated its marketing and promotional materials to
28  include disclosures about the security risks posed by the Quectel EG065K module. By

failing to do so, Axon perpetuated the misleading impression that its products were secure. In addition, Axon could have engaged in public relations campaigns to address the concerns raised by GovGPT and assure the public and its customers that it was taking steps to mitigate any security risks. The absence of such efforts reinforces the argument that Axon intentionally chose not to disclose the material information.

88. The omission regarding the Quectel EG065K module is material because it directly impacts the perceived security and reliability of Axon's products, which are critical factors for law enforcement agencies. Axon's failure to disclose this information not only misled customers but also harmed GovGPT by allowing Axon to maintain an unfair competitive advantage in the market. By keeping this information concealed, Axon effectively stifles competition from GovGPT and other potential entrants who could offer safer and more secure alternatives. This anti-competitive impact is central to the Lanham Act claim.

## AXON'S DOMINANT FINANCIAL POSITION

89. Axon's unlawful monopolization of body worn camera systems is further evidenced by its persistent, high profit margins.

90. Axon's Q2 2024 financial report demonstrates the company's substantial financial dominance, with total revenue of $504 million, a 35% increase year over year. Axon's Cloud & Services revenue grew by 47% to $195 million, highlighting the nearly complete dependence of more than 94.4% of America's law enforcement agencies on Axon's integrated ecosystem.

91. A December 2019 Axon investor presentation indicated that Axon body worn camera systems control 47 of the 69 U.S. Major City Chiefs Agencies.[59] Measured in terms of output or revenue, Axon's market share among large U.S. cities is even higher than 80%—likely at least 85%.[60] As of 2020, Axon reported having a customer relationship with 17,000 of the nation's 18,000 law enforcement agencies (94.4%).[61]

92. Axon stock has risen exponentially from 2022 to 2024, making a nearly seventeen-fold increase from 2017 to 2024, as shown below:



[62]

[59] Investor Presentation, Axon Enterprise, December 2019, at 6, Axon Enterprise (December 2019), as described in 3:23-cv-07182-RK-RLS, Dkt. 37, Page 19 of 64.

[60] Consistent with this figure, an analysis published by investment advice website Motley Fool concluded that, immediately after and as a direct result of the Acquisition, Axon "own[ed] 80% of all big-city police department contracts." Rich Duprey, *Axon Enterprise Now Owns the Police Body Cam Market*, MOTLEY FOOL, (May 18, 2018), (last viewed September 22, 2024), https://www.fool.com/investing/2018/05/18/is-there-any-stopping-axon-enterprise-now.aspx.

[61] As of 2020, Axon reported having a customer relationship with 17,000 of the nation's 18,000 law enforcement agencies (94.4%). Akela Lacy, *Two Companies Fight To Corner The Police Body Camera Market*, INTERCEPT, (Dec. 8, 2021), (last viewed Sept. 22, 2024), https://t.co/3HqLDySGCH.

[62] *Stock Chart* generated by Google on September 17, 2024 at 12 noon PST.

93. This is indicated by a chart showing Axon body worn camera systems' dominance in terms of U.S. Major City Chief Agencies ranked by size, starting with New York City at the top left, then moving downward and spilling over into the subsequent columns, with the smallest agency in the chart being Salt Lake City, at bottom right:[63]

## Serving the top tier (Major City Chiefs)

| | | |
|---|---|---|
| New York City, New York | Baltimore, Maryland | Oklahoma City, Oklahoma |
| Chicago, Illinois | Charlotte-Mecklenburg, North Carolina | Cincinnati, Ohio |
| Los Angeles County, California | Atlanta, Georgia | El Paso, Texas |
| Los Angeles, California | Indianapolis, Indiana | Tucson, Arizona |
| Philadelphia, Pennsylvania | Cleveland, Ohio | Buffalo, New York |
| Houston, Texas | Fairfax County, Virginia | Tampa, Florida |
| Washington D.C. | Prince George's Co, Maryland | Portland, Oregon |
| Detroit, Michigan | Fort Worth, Texas | Minneapolis, Minnesota |
| Las Vegas, Nevada | Kansas City, Missouri | DeKalb County, Georgia |
| Dallas, Texas | Denver, Colorado | Long Beach, California |
| Baltimore County, Maryland | Jacksonville, Florida | Albuquerque, New Mexico |
| Phoenix, Arizona | Nashville, Tennessee | Mesa, Arizona |
| Nassau County, New York | San Jose, California | Fresno, California |
| Miami-Dade, Florida | St. Louis, Missouri | Virginia Beach, Virginia |
| Suffolk County, New York | New Orleans, Louisiana | Omaha, Nebraska |
| Memphis, Tennessee | Tulsa, Oklahoma | Orlando, Florida |
| San Francisco, California | Newark, New Jersey | Raleigh, North Carolina |
| Milwaukee, Wisconsin | Louisville, Kentucky | Wichita, Kansas |
| Honolulu, Hawaii | Seattle, Washington | Sacramento, California |
| San Antonio, Texas | Montgomery County, Maryland | Aurora, Colorado |
| Boston, Massachusetts | Miami, Florida | Arlington, Texas |
| Columbus, Ohio | Austin, Texas | Oakland, California |
| San Diego, California | Pittsburgh, Pennsylvania | Salt Lake City, Utah |

Axon network    Competitor    No cameras

94. As the chart shows, of the 69 Major City Chief members, Axon controlled 4 of the top 5, 7 of the top 10, and 15 of the top 20. In other words, Axon similarly dominated among the very largest U.S. agencies, which are much larger than the smaller Major Cities Chiefs Association ("MCCA") agencies. According to available data, around this same time, New York City and Chicago alone accounted for approximately

---

[63]Amended Complaint, *Township of Howell et. al. vs. Axon Enterprise, Inc. et al*, U.S. Dist. N.J. Case No. 3:23-cv-7182, filed Aug. 22, 2023, Dkt. 37. .

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

31% of the total officers and non-sworn personnel of all U.S. MCCA members combined. [64]

95. Assuming that New York and Chicago made up 31% of the market represented by the MCCA, and that the remaining 67 MCCA cities each represent an equal share of the remaining 69% of the market (a simplifying assumption), then according to the data from its December 2019 investor presentation, Axon had 85% of the market represented by the MCCA.

96. Axon acknowledges its dominance—according to the FTC, in a company presentation, Axon implored its salespeople to "embrace being the gorilla," and Axon's CEO confirmed that Axon is a "really strong market leader."[65]

97. Axon's annual recurring revenue (ARR) grew by 50% to $825 million as of May 2024, indicating a strong and growing customer base tied to Axon's subscription services. The company reported a net income of $133 million, supporting non-GAAP net income of $89 million and an adjusted EBITDA of $109 million, reflecting its significant profitability and market influence.

98. Axon's 2023 annual report further reveals that its total revenue for 2023 was

---

[64] The MCCA says its members comprise a workforce of 222,973 officers and non-sworn personnel in the U.S. Corporate Partnerships. *Corporate Partnerships*, MAJOR CITIES CHIEFS ASSOCIATION, (last viewed Sept. 22, 2024), https://majorcitieschiefs.com/corporate-partnerships/#:~:text=MCCA%20membership%20is%20comprised%20of,officers%20and%20non%2Dsworn%20personnel.

[65] Complaint, *Axon Enter., Inc.*, FTC Dkt. No. D9389 ¶ 30 (Jan. 3, 2020), https://fingfx.thomsonreuters.com/gfx/legaldocs/xmvjljzdzvr/Augusta%20v%20Axon%20-%2020231004.pdf

$1.56 billion, with 86% of its revenue derived from the United States alone. The Software & Sensors segment, including Axon Evidence and other cloud services, contributed significantly to this growth, with revenue increasing from $426 million in 2021 to $951 million in 2023.

99. According to Axon's Q1 2024 quarterly report, "Our integrated subscription plans drive value for our customers beyond what can be achieved through disparate point solutions and our software growth is also linked to record demand for our body-worn cameras and digital evidence management products."[66] This admission highlights how Axon uses its integrated ecosystem to lock customers into its products and services, reducing the likelihood that customers will seek or switch to competing solutions.

100. In its administrative complaint against Axon and Safariland, the FTC noted that Axon was the market leader for body worn camera systems, with VieVu as the next largest competitor.[67]

101. The Herfindahl-Hirschman Index ("HHI") measures and grades market concentration by adding the squared market share percentages of each competitor in the market. HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share.

---

[66] *Axon Reports Q1 2024 Revenue of $461 Million, Up 34% Year Over Year, Raises Outlook*, AXON, (May 6, 2024), (last viewed September 22, 2024), https://investor.axon.com/2024-05-06-Axon-reports-Q1-2024-revenue-of-461-million,-up-34-year-over-year,-raises-outlook.

[67] Complaint*, Axon Enter., Inc.*, FTC Dkt. No. D9389 ¶ 30 (Jan. 3, 2020).

102.    According to the Horizontal Merger Guidelines issued by the Department of Justice ("DOJ") and the Federal Trade Commission ("FTC"), a merger that increases the HHI by more than 200 and results in an HHI above 2,500 in any market is presumed to be anticompetitive, and therefore unlawful.[68]

103.    According to FTC estimates, in 2018, Axon's acquisition of VieVu increased total market concentration by more than 200 HHI points and created a post-merger HHI exceeding 2,500 points.[69]

104.    In addition to reducing competition, Axon limited the availability of VieVu body worn camera systems to customers and stopped developing new generations of VieVu hardware and software.[70]

105.    In June 2020, the FTC settled with Safariland after Axon and Safariland rescinded the noncompete provisions they entered into related to the Acquisition. But the FTC's administrative action against Axon (which further sought to undo the Acquisition) remained pending while Axon challenged the FTC's constitutional authority in court. In October 2023, less than a year before the initiation of this action.[71] The FTC dismissed

---

[68] DOJ & FTC, *Horizontal Merger Guidelines* 19 (2010). The DOJ and FTC have released draft merger guidelines, which presume anticompetitive any merger that increases HHI by more than 100 points and results in a market HHI greater than 1,800. DOJ & FTC, *Draft Merger Guidelines* (2023)

[69] Complaint, *Axon Enter., Inc.*, FTC Dkt. No. D9389 ¶ 34 (Jan. 3, 2020).

[70] Luke Schiefelbein, *Why Taser Stock Could Have Shocking Upside*, FORBES (Mar. 13, 2018), (last viewed Sept. 22, 2024), .

https://www.forbes.com/sites/lukeschiefelbein/2018/03/13/why-taser-stock-could-haveshocking-upside/?sh=47c4b26077d7

[71] See *Township of Howell et al. v. Axon Enterprise, Inc. et al.*, No. 3:23-cv-7182 (D.N.J. filed Aug. 22, 2023).

its administrative action against Axon, stating that the delay from Axon's ongoing constitutional challenge made "a timely resolution" of the FTC's enforcement action "increasingly unlikely." In doing so, the FTC stood by its allegations that the Acquisition "create[ed] a monopoly and harm[ed] both police departments and communities who fund them.[72]

106.    The FTC proposed an amicus brief in the *Township of Howell* litigation on June 17, 2024.  (Case: 3:23-cv-07182-RK-RLS, ECF 86-2).  The amicus brief proposed by the Federal Trade Commission (FTC) in the related case argues that Axon's acquisition of VieVu, a competing body-worn camera company, and the subsequent non-compete agreements with Safariland, were designed to eliminate competition. This aligns with GovGPT's arguments that Axon is monopolizing the market for body-worn cameras, stifling competition, and limiting choices.  The FTC brief underscores that the elimination of perceived potential competitors can harm competition, even if those competitors were not yet active in the market. This directly supports GovGPT's argument that Axon's actions eliminated not only actual competitors but also potential

---

[72] *United States: FTC's abandonment of case against Axon clouds Administrative Merger Challenges*, GLOBAL COMPLIANCE NEWS,  (Nov. 3, 2023), (last viewed Sept 22, 2024), https://www.globalcompliancenews.com/2023/11/03/https-urldefense-com-v3-__https-service-infongen-com-cgrmdwxscgmxmdukatekqezxwlpiwwqwvkfvc0tpag9tqlhzaxh3vdzkmwz3n0ppagvrt2r0ykdawkdoqmpyexvseu5lwna3stromuuvyva3d-newsletters-article-showndnl_5-8/#:~:text=In%20a%20statement%20announcing%20the,decision%2C%20the%20FTC%20is%20likely

ones, thereby suppressing innovation and allowing Axon to maintain and abuse its dominant market position.

107.   Adding to this high market concentration, body worn camera system contracts generally last for 5– 10 years, limiting the ability of other body worn camera system providers to compete with Axon. Further limiting competition, police departments have high switching costs between body worn camera systems, as police departments must learn complex, new procedures for storing and using evidence. Axon is well aware of these high switching costs: in 2017, it offered free body cameras to police departments, which came with a one-year trial subscription to Evidence.com.[73]

108.   Those "free" cameras enticed police departments into using the Axon body worn camera system, because Axon's body cameras only work with Axon software. Safariland's then-Executive Vice President called the Axon offer for free body cameras a "Venus fly trap" and noted that "there's a whole back end to it that has implementation costs and makes it very difficult to switch out of once you're done.[74]

109.   During the May 30, 2024 conversation with GovGPT, Henrik Kuhl, SVP of Strategy & Corporate Development at Axon, made an admission against interest. He

---

[73] Cyrus Farivar, *Taser Stuns Law Enforcement World, Offers Free Body Cameras to All US Police*, ARSTECHNICA, (Apr. 5, 2017), (last viewed Sept. 22 2024), https://arstechnica.com/tech-policy/2017/04/taser-announces-free-body-cameras-cloud-storage-to-all-us-cops-for-a-year/;   Elizabeth Joh & Thomas Joo, *The Harms of Police Surveillance Technology Monopolies*, 99, DENV. L. REV. FORUM, 1, 17 (2022).
[74] *In the Police Body Camera Business, the Real Money's on the Back End*, MARKETPLACE, (Apr. 18, 2017), (last viewed Sept. 22, 2024), https://www.marketplace.org/2017/04/18/police-body-camera-business-real-moneys-on-back-end/.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

acknowledged that the Axon Body 4 cameras are designed to function exclusively with Axon's proprietary Evidence.com software, rendering the hardware "nothing other than a paperweight" without a Evidence.com software subscription. Mr. Kuhl's admission supports Plaintiff's contention that Axon's advertisement on its website boasts that "We also allow for bulk export of your evidence data out of Evidence.com in case you want to try another system."[75] is false because it implies that law enforcement agencies can try competing digital evidence management systems without making their Axon body cameras inoperable.

110.    Moreover, Mr. Kuhl's admission supports Plaintiff's contention that Axon's advertisement on its website boasting that "We will win and retain your business by providing great products and an awesome user experience, not by restricting your ability to leave" is false because it implies that Axon does not restrict the ability to leave its platform, when in fact, Axon body cameras only work with Evidence.com subscriptions, and Axon restricts competitors from selling competitive  digital evidence management solutions to customers using Axon body cameras.   *Id.*

111.    This statement highlights Axon's deliberate strategy to create a closed ecosystem, compelling law enforcement agencies to invest continuously in Axon's software to utilize their hardware. This approach reinforces Axon's market dominance, limiting customer choice and stifling competition. Such an admission is crucial as it

---

[75] https://www.axon.com/company/principles,  last viewed Sept. 22, 2024.

exposes the company's anti-competitive practices, raising significant concerns about monopolistic behavior and its impact on market dynamics and public safety.

112. Because of these high switching costs, police departments seldom switch their body worn camera system provider from one contract to another when a contract is renewed.[76]

113. This "free" Evidence.com subscription also served to entrench Axon's position in the Digital Evidence Management Systems market, since Evidence.com "seamlessly integrates with Tasers." This integration further locked purchasers into the Axon system for both Digital Evidence Management Systems and Body-Worn Cameras (BWCs). [77]

114. Axon further holds its monopoly on its body worn camera systems by integrating its Tasers and Axon Fleet 3 dash cams with its Evidence.com digital evidence management system. Accordingly, police departments that want to integrate Taser and Axon Fleet 3 dash cams data into their evidence software must use the Axon body worn camera system. *Id.*

115. For police department users, Axon now bundles together its supply of Tasers and body worn camera systems. Axon negotiates supply for both services in one contract, allowing it to get economics of scale that reduce competition further.

---

[76] *Id.*
[77] Inkwood Research, *United States Conductive Electrical Weapons Market 2023–2030*, at 36 (2023); Schiefelbein, supra note 23, at 32.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

116.    Axon has an unusual practice of handing out large cash bonuses in a secretive and selective manner reminiscent of mafia-like operations in terms of reinforcing loyalty through difficult to trace financial incentives.  For instance, there have been instances where $50,000 was delivered on a restaurant platter and tens of thousands of dollars were given in a designer bag. The use of physical cash instead of electronic payments helps evade the creation of a digital paper trail, making these transactions difficult to trace and audit.  Axon manifests characteristics of a corrupt organization through its practice of handing out large cash bonuses in secretive and extravagant ways. This behavior indicates a deliberate effort to obscure financial dealings and manipulate employee loyalty, which are hallmark signs of corporate corruption. *Id.*

117.    Axon's compensation practices for its top executives reveal a pattern of deceptive and unethical behavior. For example, a $2 billion stock option award (value as of July 2024) which vested in 2023 made CEO Rick Smith approximately $400 per year between 2018-2023. *Id.*  This not only made Rick Smith into a billionaire and one of the world's highest-earning CEO for each of the last five years with stock grants included. Rick Smith's acceptance of the 2018 five-year stock deal if the company met certain financial goals, likely reflects his knowledge of Axon's impending monopoly.[78] This

---

[78] Larry Dignan, *Axon Moves 20 PB of Data from Evidence.com to Microsoft Azure,* ZDNET, (Feb. 28, 2018), (last viewed  September 22, 2024), https://www.zdnet.com/article/axon-moves-20-pb-of-data-evidence-com-to-microsoft-azure/ (Axon reported strong fourth quarter results and detailed a December migration to Microsoft Azure as well as other cloud-centric implementations.).

monopoly was solidified through the strategic partnership with Microsoft, which began that same year with the migration of Axon's digital evidence data to Microsoft Azure. This agreement played a critical role in Axon's market consolidation, creating substantial barriers for competitors and establishing Axon's dominance in the digital evidence management market. Smith's compensation alignment into the monopolistic goals of Axon's collaboration with Microsoft underscores the deliberate and strategic actions taken to cement Axon's market power, further illustrating the company's manipulative and self-serving practices.

118.    In addition, in 2023, Axon spent hundreds of thousands of dollars in recent years to sponsor and provide security for an Arizona golf tournament run by a fraternal professional society, of which Axon President Josh Isner is a leading member. Upon information and belief, numerous police Axon customers were invited to the event. This expenditure, which interviews and online records confirm, was not disclosed to the SEC. Such undisclosed spending, especially when benefiting key executives, highlights a culture of financial manipulation and self-dealing. *Id.*

## IMPORTANCE OF ALLOWING CUSTOMERS TO PURCHASE DEBUNDLED DIGITAL EVIDENCE MANAGEMENT SOFTWARE

119.    Allowing police departments and municipalities to purchase and utilize debundled digital evidence management software that is compatible with Axon's body camera hardware without requiring subscriptions to Evidence.com is critical for several

reasons:

120. **Consumer Choice:** The Federal Trade Commission Act and antitrust laws aim to promote competition and prevent monopolistic practices. When digital evidence management software is tied exclusively to Axon's body cameras, law enforcement agencies have no choice but to use Evidence.com, limiting their options. Allowing competitors to offer compatible software promotes consumer choice, ensuring that agencies can select the best products for their specific needs.

121. **Innovation:** Competition drives innovation. When multiple software providers can offer their solutions such as GovGPT, they are incentivized to improve their products continuously, leading to technological advancements that benefit law enforcement agencies. This competition fosters a dynamic market where providers strive to offer better features, enhanced security, and improved user experiences.

122. **Market Fairness:** Antitrust laws, such as the Sherman Act and Clayton Act, are designed to prevent monopolistic practices that stifle competition. Axon's practice of bundling its body cameras with Evidence.com creates an unfair market advantage, making it difficult for other software providers such as GovGPT to compete. By allowing debundling, the market becomes more open and competitive, fostering a fair playing field for all providers.

123. **Resource Allocation:** Lower costs for more capable technology such as technology offered by GovGPT means that municipalities can allocate more resources to other critical areas, such as community policing, training, and public safety initiatives.

124. For these reasons, allowing competition for debundled digital evidence management software compatible with Axon's body camera hardware is crucial for promoting competition, preventing monopolistic practices, protecting consumer rights, ensuring data privacy and security, and achieving economic efficiency. These objectives align with the goals of the FTC Act, Sherman Act, Clayton Act to ensure a fair, transparent, and competitive market that promotes competition.

**MARKET DEFINITION AND COMPETITIVE BARRIERS IN SITUATIONAL AWARENESS AND SOFTWARE FOR LAW ENFORCEMENT**

125. The product market ("Markets") includes:

126. **Body-Worn Cameras (BWCs):** Body worn devices for recording interactions between law enforcement and the public. (e.g., Axon Body 4 and similar).

127. **Digital Evidence Management Systems:** Platforms that help law enforcement agencies manage, analyze, comprehend, and store digital evidence, ensuring efficient and secure handling of data collected from body-worn cameras and other devices, including with artificial intelligence. (e.g., Evidence.com).

128. **Public Safety Video Integration and Management Platforms:** Systems that integrate live video feeds from multiple sources (public, private, and third-party cameras) into a centralized platform for real-time monitoring, analysis, and response coordination by law enforcement agencies. (e.g., Fusus).

129. The geographic market is the United States, with particular focus on law enforcement agencies at local, state, and federal levels. A hypothetical monopolist in

any of these markets would find it profit-maximizing to not only impose at least a small but significant and non-transitory increase in price ("SSNIP"), but also to limit competition by restricting access to critical data or technology (such as propriety digital evidence management systems), thereby reinforcing its market dominance and deterring potential entrants.

130.   In defining the relevant market for this antitrust case, it is appropriate to consider the cluster market approach, which applies when multiple interrelated products are functionally integrated and serve the same core purpose. In the case of Axon's offerings, the products include body-worn cameras, AI-powered digital evidence management systems, real-time threat detection systems, and peripheral devices (such as holsters and drones). These products work together as a unified system in law enforcement operations, providing complementary functions like evidence collection, situational awareness, and real-time safety enhancements.

131.   Courts have long approved defining cluster markets for antitrust purposes when the products involved are tightly integrated and serve interrelated needs, as in *United States v. Philadelphia National Bank,* 374 U.S. 321 (1963). In this case, Axon's products collectively form a monopolistic technological ecosystem that limits competition by creating a closed ecosystem not accessible by competitors. Therefore, the market for these technologies should be treated as a single cluster market encompassing body-worn cameras, AI-powered systems, and integrated peripherals. Axon's dominant position across these interconnected technologies limits competition, making this cluster

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

market definition critical to analyzing their anticompetitive conduct.

132.    Plaintiff pleads that Axon substantially reduced competition and maintained its monopoly power in the market by eliminating potential competition from Safariland. A merger that "eliminates a potential competitor exercising present influence on the market" can violate Section 7 of the Clayton Act. *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 532 (1973).    Showing that Axon viewed entry by Safariland into the Digital Evidence Management Systems market as a real threat, Axon's CEO called this noncompete a "hidden jewel in the deal."[79]  Identifying a potential competitor is a fact-specific inquiry that focuses on whether the entity's presence had a "likely influence" on the market. *Id*. at 533-34.

133.    This cluster market approach is appropriate because Axon's products operate as a unified system, and competition must be evaluated across all these interrelated technologies. Axon's dominant position in this cluster market impedes potential entrants like GovGPT, who would otherwise compete in this integrated space, making it a valid plaintiff to challenge Axon's anticompetitive practices. Thus, GovGPT's standing is based on the foreseeable impact of Axon's monopolistic conduct on future market entrants.

### **TOLLING OF STATUTE OF LIMITATIONS**

134.    Plaintiff is not the only one to have alleged that these agreements violated the antitrust laws. In 2020, the Federal Trade Commission ("FTC")—by a bipartisan, 5-0

---

[79] FTC Compl. ¶ 46.

vote—took the same position, bringing an administrative action (the "FTC Action") for injunctive relief asserting that the Acquisition and the Non-Competes unlawfully restricted competition in the Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems markets. That action resulted in a settlement with Safariland that rescinded the Non-Competes, but did not unwind the Acquisition, as Axon continued to contest the FTC Action both before the FTC and via a radical challenge to the constitutionality of the FTC's administrative adjudication process in federal court. Axon's constitutional challenge effectively stalled the FTC Action for years as preliminary jurisdictional questions about Axon's suit worked their way through the courts, resulting in a stay of the FTC Action pending resolution of the constitutional case.

135.    Ultimately, in October 2023—shortly after the first of these actions had been filed—the FTC dismissed its action, citing the prospect of "years of additional litigation" over Axon's constitutional claims that would "further delay[] the administrative adjudication," and an "increasingly unlikely possibility of reaching a timely resolution of the antitrust merits," while standing by the merits of its complaint and reaffirming its view that Axon's acquisition of VieVu was an "anticompetitive merger" that "harms markets and adversely affects the American people." CAC ¶ 132 (quoting Order Returning Matter to Adjudication and Dismissing Complaint, FTC No. 9389 (Oct. 6, 2023).

136.    The federal government's initiation of its antitrust action concerning Axon's

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

unlawful conduct operates to toll any federal statute of limitations under Section 5(i) of the Clayton Act, 15 U.S.C. § 16(i), which tolls the running of the statute of limitations "during the pendency" of a government action about the same matter "and for one year thereafter."[80]

137.    When interpreting Section 5(i), "effect must be given to the broad terms of the statute itself—'based in whole or in part on any matter complained of'—read in light of Congress' 'belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws.'" *Leh v. Gen. Petroleum Corp.*, 382 U.S. 54, 59 (1965) (quoting *Minn. Mining & Mfg.*, 381 U.S. at 318). Thus, Section 5(i)'s "tolling provision, if of doubtful meaning, should be interpreted in a way which will permit a determination on their merits of private claims . . . ." *New Jersey v. Morton Salt Co.*, 387 F.2d 94, 97 (3d Cir. 1967). The "based in whole or in part" standard requires "substantial identity of subject matter" between the FTC and private cases, but the private plaintiff need not allege the same means, objectives, or legal theories as the FTC. *Leh*, 382 U.S. at 57-59; see also *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2019 WL 130535, at *9 (E.D. Pa. Jan. 8, 2019) (Section 5(i)'s "remedial purpose counsels in favor of construing the provision liberally").

---

[80] Section 5(i) of the Clayton Act states:  "Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, the running of the statute of limitations in respect of every private right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter." (15 U.S.C. § 16(i))

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

138.    The FTC, like the Plaintiff here, challenged Axon's acquisition of VieVu. See Axon Mot. Ex. A ("FTC Compl.") ¶ 2. The FTC alleged that the Acquisition eliminated competition between Axon and VieVu in the Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems markets. *Id.* ¶¶ 35-43. Therefore, GovGPT's action is "based in whole or in part on any matter complained of" in the FTC proceeding.

139.    Here, the four-year statute of limitations for Plaintiff' claims concerning the Acquisition and the accompanying Non-Competes began running, at the earliest, on the date of the Acquisition, May 3, 2018. The FTC's lawsuit challenging the Acquisition tolled the limitations period while it was pending from January 3, 2020 until October 6, 2023 (and for one year thereafter). 184. Plaintiff brought their action within one year after that time period, on July 29, 2024. See ECF No. 1. Thus, because there is a "substantial identity of subject matter" between Plaintiff' case and the FTC's, the limitations period for Plaintiff' claims was tolled while the FTC action was pending, making Plaintiff' claims timely under Section 5(i). Plaintiff' claims satisfy the liberal "substantial identity" standard because they are based on the same anticompetitive conduct and effects "complained of" by the FTC. See *Leh*, 382 U.S. at 59.

140.    The statute of limitations is further tolled because Defendants' fraudulently concealed their conspiracy. Specifically, Defendants fraudulently concealed the ancillary noncompete agreements that they entered into in connection with the Acquisition. Defendants' affirmative acts of fraudulent concealment in connection with their anticompetitive conduct in the Body-Worn Cameras (BWCs) and related markets

prevented Plaintiff from having notice of their claims more than four years before filing this Complaint, and tolled the statute of limitations on Plaintiff' claims.

141.    Many of the overt acts in furtherance of the conspiracy alleged in this complaint were done with the purpose of concealing the conspiracy and preventing competitors from learning about the conspiracy's existence. Accordingly, Plaintiff did not know or reasonably suspect the existence of their claims more than four years before filing this Complaint, nor were they aware of any facts more than four years before filing this Complaint that would have put them on reasonable notice of their claims.

### **TOLLING DESPITE PLAINTIFF'S LATER ENTRY INTO MARKETS**

142.    Section 5(i) does not limit tolling to Plaintiff who existed at the time of the government action or the original violation.  What matters is that the plaintiff suffered an injury caused by the antitrust violation during the tolled period.  What matters is that the plaintiff suffered an injury caused by the antitrust violation continuing during the tolled period. Since GovGPT was formed and began operations during the tolled period, and alleges injury from ongoing anticompetitive conduct, it should be entitled to the benefits of tolling.

143.    Moreover, antitrust violations are   in nature. Since Axon's anticompetitive conduct has continued into the period when GovGPT was formed and entered the market in 2024, GovGPT's claims are timely because they are based on ongoing violations. GovGPT alleges that it suffered harm due to Axon's continued monopolistic practices, such as exclusive agreements with Microsoft and bundling strategies for Evidence.com

and Fusus, which persisted beyond the initial acquisition of VieVu and into the time when GovGPT was operational.

144.     The Clayton Act aims to encourage private parties to assist in antitrust enforcement. Denying GovGPT the benefit of tolling would discourage new market entrants from seeking redress for antitrust injuries.  Allowing Axon to escape liability for ongoing anticompetitive effects simply because GovGPT was formed after the initial violation would be unjust and contrary to the purposes of antitrust laws, which are designed to protect competition and new entrants.

145.     The FTC's recognition of ongoing anticompetitive effects supports GovGPT's position that Axon's conduct continued into the period when GovGPT was formed and began operations.

146.     FTC's proposed amicus brief in the *Township of Howell* litigation on June 17, 2024 (Case: 3:23-cv-07182-RK-RLS, ECF 86-2)   refutes any argument that the perceived potential competition doctrine is irrelevant to Sherman Act claims. The FTC's proposed amicus brief argues that eliminating potential competitors can constitute harm under both Section 1 and Section 2 of the Sherman Act.    Thereby, the FTC's brief reaffirms that it initiated an antitrust action against Axon, challenging Axon's acquisition of VieVu and associated non-compete agreements as violations of antitrust laws.

147.     The FTC clarifies that the dismissal of its administrative complaint against Axon was due to procedural delays caused by Axon's constitutional challenges, not because of any lack of merit in the antitrust claims. The FTC explicitly states that the

1   dismissal "was not a reflection on the merits of the administrative enforcement matter or

2   the legality of the transaction."  The FTC's confirmation of its action against Axon

3   means that the statute of limitations was tolled from the initiation of the FTC's complaint

4   in 2020 until its dismissal in October 2023, plus one additional year (until October

5   2024).

6   148.    Moreover, the FTC distinguishes between "actual competitors," which are

7   firms currently competing in the market, and "potential competitors," which are firms

8   that are not currently in the market but could enter it and thus influence competitive

9   dynamics. The FTC emphasizes the concept of "perceived potential competition," which

10  refers to firms that may not have entered the market yet but are perceived by existing

11  players as likely to do so. This perception can deter existing firms from engaging in

12  anticompetitive behavior, such as raising prices or reducing output, because of the threat

13  that the potential competitor might enter the market and challenge their position. In the

14  case of GovGPT, Axon's actions to hinder GovGPT's growth prevent a new and

15  innovative player from bringing fresh competition to the market, which result in higher

16  prices and reduced innovation for consumers, particularly law enforcement agencies.

17  This validates GovGPT's position that Axon's conduct is not just a violation of the

18  Clayton Act but also of the Sherman Act, providing a legal basis for GovGPT's antitrust

19  claims.

20  149.    The FTC also alleged that Axon and Safariland entered into a series of

21  Non-Competes, memorialized in the Acquisition Agreement and the Holster Agreement,

that reduced competition for Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems markets. *Id.* ¶ 44. Under the Non-Competes, Safariland agreed not to enter the related markets or to solicit Axon's customers, and Safariland and Axon agreed not to solicit one another's employees. *Id*. ¶¶ 45-53. Here, Plaintiff' allegations substantially overlap with the FTC's case: Plaintiff alleges that the Acquisition and Non-Competes in the Acquisition Agreement and Holster Agreement reduced competition for the relevant markets, because the actions continue with Microsoft and the acquisition of Fusus.

150. Here, the four-year statute of limitations for Plaintiff' claims concerning the Acquisition and the accompanying Non-Competes began running, at the earliest, on the date of the Acquisition, May 3, 2018. The FTC's lawsuit challenging the Acquisition tolled the limitations period while it was pending from January 3, 2020 until October 6, 2023 (and for one year thereafter).

151. Since GovGPT filed its complaint within the tolled period (before October 6, 2024), its claims are timely. See ECF No. 1.

**FIRST CLAIM FOR RELIEF**
FALSE ADVERTISING AND UNFAIR COMPETITION
THE LANHAM ACT, 15 U.S.C.. § 1125(a)
*(Against Axon by Plaintiff GovGPT)*

152. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

153. The Lanham Act, 15 U.S.C. § 1125(a)(1)(B), prohibits any person from using

false or misleading statements to misrepresent the nature or qualities of his services in commercial advertising or promotion.

154.    On May 30, 2024, GovGPT urged Axon senior management in a video call to redesign their products without Quectel components and inform U.S. police departments of the security risks associated with the Quectel EG065K module in Axon Body 4 cameras.

155.    Despite multiple opportunities after the May 2024 meeting with GovGPT, Axon failed to notify customers about the security risks of the Quectel EG065K module in Body 4 cameras. Axon did not issue formal notifications, update marketing materials, or launch public relations campaigns to address these concerns, thereby misleading customers into believing its products were secure. This suggests Axon intentionally withheld critical information.

156.    On September 18, 2024, the U.S. and allies dismantled a Chinese government-controlled botnet of 260,000 devices, many by companies using Quectel cellular IoT modules, that spied on American citizens and organizations for four years.

157.    Axon previously reported vulnerabilities in Axis cameras (Security Advisory Axon-1702) but concealed similar risks in its Axon Body 4 cameras.  In fact, nowhere on the Axon website is the name Quectel even mentioned, including its Trust Center, which purportedly provides "transparent" disclosure to its customers.[81]

158.    Despite knowing these risks, Axon did not disclose them, misleading

---

[81] See Axon Trust Center, https://trust.axon.com, last viewed Sept. 22, 2024.

customers about the security of its products and harming competitors who offer secure alternatives.

159.   Axon violated the Lanham Act by making the following misleading statements on its website[82]:

a.   "WINNING RIGHT: We maintain transparency and operate equitably." (**Misleading statement #1**) (*literally false*)

b.   "We're Transparent" (**Misleading statement #2**)   (*literally false*)

c.   "We also allow for bulk export of your evidence data out of Evidence.com in case you want to try another system."[83] (**Misleading statement #3**) (*misleading by omission*)

d.   "We will win and retain your business by providing great products and an awesome user experience, not by restricting your ability to leave." **Misleading statement #4**) *Id.*  (*literally false*)

e.   We use data to drive ideas and constantly put ethical rigor behind how we design"; (**Misleading statement #5**)   (*misleading*)

---

[82] https://www.axon.com/responsibility#, last viewed Sept. 22, 2024.
[83] https://www.axon.com/company/principles,  last viewed Sept. 22, 2024.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB





160.    **Misleading Statement #1:**

**"WINNING RIGHT:  We maintain transparency and operate equitably."**

161.    Plaintiff alleges that Axon failed to disclose the presence of the Quectel EG065K modules in its Axon Body 4 cameras. These modules pose significant security risks due to potential exploitation by the Chinese Communist Party (CCP), as Quectel is subject to Chinese laws that may compel cooperation with government entities.

162.    Axon creates a false impression of transparency by claiming to maintain transparency while concealing critical security vulnerabilities despite the Congressional reports by the Select Committee for the CPP made public on January 4, 2024, Axon misleads customers into believing that they are fully informed about the product's characteristics and risks.[86]

163.    This statement has an impact on purchasing decisions because law enforcement agencies and municipalities make procurement decisions based on vendors' commitments to transparency and ethical operations due to the sensitive nature of their work.  By claiming transparency and equitable operations, Axon positions itself as a trustworthy and ethical company, which can sway customers away from competitors like GovGPT.

---

[86] *Gallagher & Krishnamoorthi Urge Administration to Blacklist Quectel for Ties to Chinese Communist Party*, House Select Committee on the Chinese Communist Party (Sept. 19, 2023), available at https://selectcommitteeontheccp.house.gov/media/press-releases/gallagher-krishnamoorthi-urge-administration-blacklist-quectel-chinese.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

164.    The statement is made on Axon's "Responsibility" commitment page, which is intended to convey serious corporate commitments and ethical standards, not mere marketing slogans. Reasonable consumers, particularly sophisticated entities like law enforcement agencies, are likely to interpret these statements as factual commitments because the claims directly relate to the core concerns of customers in this market—transparency about product features and security, and equitable treatment in business dealings.

165.    Under the Lanham Act, actionable statements are those that are specific and factual, capable of being proven true or false, and likely to influence purchasing decisions.   The phrase "WINNING RIGHT: We maintain transparency and operate equitably" constitutes specific, factual representations about Axon's business practices that are capable of being proven true or false and upon which consumers and competitors can reasonably rely.   Specifically, the use of "We maintain" and "We operate" conveys a definitive, ongoing commitment rather than an aspirational goal or subjective opinion.   This language suggests that Axon has established policies and practices in place to ensure transparency and equitable operations.

166.    The statement is a material representation because it is capable of verification and falsification.  Transparency can be assessed by examining whether Axon discloses all material information, including potential security risks associated with its products. Since Axon conceals critical information, such as the security vulnerabilities of the Quectel modules, the claim of maintaining transparency can be proven false.   The

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

omission is material as it directly affects product safety and security, which is a critical factor for customers. The statement misrepresents the company's practices by asserting transparency while concealing material facts. Customers are deceived into purchasing Axon's products under false pretenses, and competitors like GovGPT suffer injury through loss of sales and market opportunities.

167. The statement is a specific and measurable claim because the claim can be objectively assessed by examining Axon's disclosure practices, such as whether it provides full and accurate information about its products, including potential security vulnerabilities like the Quectel module risks. In industries dealing with law enforcement technology, transparency is crucial for security and trust. Customers expect full disclosure of any factors that might affect product integrity.

---

**Misleading Statement #2:**

**"We're Transparent."**

168. Axon's failure to disclose the material security risks associated with its products directly contradicts this broad claim of transparency. The statement is actionable under the Lanham Act because the statement is literally false or, at the very least, misleading due to the omission of critical information. Competitors like GovGPT are disadvantaged when consumers are misled by Axon's false claim of transparency. This distorts the competitive market by basing purchasing decisions on misleading

information.

169.   The phrase "We're Transparent" displayed prominently in big bold letters at the top of Axon's "PRINCIPLES Our commitment to you" web page is not non-actionable puffery because it constitutes a specific, factual representation about Axon's business practices that is capable of being objectively verified and upon which consumers and competitors can reasonably rely.   The contextual importance of the statement made in the context of "Axon's PRINCIPLES Our commitment to you," is that this page implies a serious and deliberate set of standards Axon promises to uphold.   It is not a fleeting advertising slogan but a cornerstone of the company's declared ethical framework.

170.   Moreover, "Transparency" is an objectively measurable quality. It can be assessed by evaluating Axon's disclosure practices, communication with stakeholders, and adherence to openness in its operations.   Transparency is a well-defined concept in corporate governance and ethics, with established standards and expectations, especially in industries impacting public safety.   Axon's claim can be measured against these standards to determine its veracity.   Since Axon withheld the security vulnerabilities associated with the Quectel modules in view of the Congressional reports by the Select Committee for the CCP made public on January 4, 2024—this directly contradicts the claim of transparency. *Id.*   Puffery typically involves subjective opinions or exaggerated claims that cannot be proven true or false (e.g., "We make the best products").   "We're Transparent" is a factual claim about Axon's business practices, asserting a commitment

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

to openness that can be substantiated or refuted with evidence.

171.    Moreover, the statement is a material representation influencing purchasing decisions because law enforcement agencies and municipalities rely heavily on vendors' transparency due to the critical nature of their work, which involves public safety and sensitive data.   The assurance of transparency is material to their decision-making process, as it affects trust in the vendor and the perceived reliability and security of the products.

172.    Under the Lanham Act, false or misleading statements of fact in commercial advertising or promotion that misrepresent the nature, characteristics, or qualities of a company's goods, services, or commercial activities are actionable.   Failure to disclose known security vulnerabilities while claiming transparency can mislead consumers who rely on the company's commitment.  Consumers and agencies may forego further due diligence based on the company's assertion of transparency, trusting that all critical information has been disclosed.  This reliance can lead to deception if the company is, in fact, concealing material facts.

---

**Misleading Statement #3:**

**"We also allow for bulk export of your evidence data out of Evidence.com in case you want to try another system."**

173.    There are practical limitations on data export because while Axon claims to

allow bulk data export, in practice, the process may be cumbersome, incomplete, or technically challenging, effectively hindering customers from switching to competitors like GovGPT.

174.    Therefore, Axon creates an illusion of freedom to switch as this statement implies that law enforcement agencies can try competing digital evidence management systems without making their Axon body cameras inoperable. This misrepresentation prevents competitors from attracting customers who believe they have the flexibility to switch but are effectively locked into Axon's ecosystem.

The statement is actionable under the Lanham Act because the statement misrepresents the ease and feasibility of exporting data, which is a feature important to customers.    This statement is material because data portability is crucial for customers considering long-term commitments to a digital evidence management system. Moreover customers are deceived into believing they have options when they do not, harming competitors who offer more flexible solutions.

---

**Misleading Statement #4:**

**"We will win and retain your business by providing great products and an awesome user experience, not by restricting your ability to leave."**

175.    This statement is misleading because it implies that Axon does not restrict the

ability to leave its platform, when in fact, Axon body cameras only work with Evidence.com subscriptions, and Axon restricts competitors from selling competitive digital evidence management solutions to customers using Axon body cameras.

176.    The statement is contrary to Axon's lock-in strategies because Axon's products are designed to work exclusively within its ecosystem (e.g., Evidence.com), and discontinuing service can render hardware unusable.

177.    Competitors like GovGPT cannot compete effectively if customers are misled into believing they can leave Axon easily when, in reality, they face significant obstacles.  The statement falsely assures customers of their freedom to switch providers.  The ability to switch vendors is a significant consideration for customers making purchasing decisions.    Customers are deceived, and competitors are harmed due to the misrepresentation of Axon's business practices.

---

**Misleading Statement #5:**

**"We use data to drive ideas and constantly put ethical rigor behind how we design."**

178.    While Axon claims to prioritize ethical rigor in design, hiding security vulnerabilities contradicts this assertion.  Given Congressional warnings, undisclosed use of potentially compromised components without disclosure raises ethical concerns, especially given the potential anticompetitive implications. Customers may choose Axon

over competitors like GovGPT based on perceived ethical standards, which are misrepresented.

179.    The statement misleads customers about the company's ethical practices in product design.  Ethical considerations are important to customers, especially in law enforcement and public safety.  The misrepresentation deceives customers and harms competitors who uphold higher ethical standards.    The statements were made in connection with services offered by Axon. The statements relate to descriptions or representations of fact that misrepresent the nature, characteristics, and quality of Axon's services.

180.    Axon's  false or misleading advertisements have caused and, unless enjoined, will continue to cause immediate and irreparable harm to GovGPT for which there is no adequate remedy at law. In addition, due to Axon's false advertisements, GovGPT has been injured, including but not limited to, reduced opportunities to compete for business through transparent disclosure of risks. Furthermore, Axon has been unjustly enriched at the expense of competitors including GovGPT due to Axon's misleading advertising. Accordingly, GovGPT is entitled to injunctive relief and to recover up to three times the damages sustained by GovGPT, as well as Axon's profits, and reasonable attorney fees under 15 U.S.C. §§ 1114, 1116, and 1117.

181.    Axon Enterprise, Inc. has engaged in deceptive practices by failing to disclose the presence of the Quectel EG065K modules in its Axon Body 4 cameras, which present significant security risks due to potential exploitation by the Chinese Communist

Party (CCP). These risks are material because the Quectel modules enable remote firmware updates, which is a backdoor for unauthorized surveillance or cyberattacks (with access provided), especially considering Quectel's obligations under Chinese law. Despite this, Axon has made and continues to make misleading statements that they "maintain transparency and operate equitably" and that they put "ethical rigor behind how we design."

182.    The omission is material because the presence of Quectel components and the associated security vulnerabilities directly affect the safety and reliability of the products used by law enforcement agencies. Customers—including police departments and municipalities—rely on Axon's representations when purchasing body-worn cameras and digital evidence management systems. Had these customers been informed about the security risks, it is likely they would have reconsidered purchasing Axon's products or chosen alternative vendors.

183.    Axon's actions have affected interstate commerce as the company provides its products to law enforcement agencies across the United States. The omission of critical information about the security risks associated with Quectel components misleads customers nationwide and jeopardizes the security of digital evidence management systems, creating a direct and substantial impact on public safety.

184.    Due to this material omission, competitors like GovGPT have suffered commercial harm, including lost sales and diminished market share.

185.    The omission of the risks posed by Quectel modules from Axon's commercial

advertisement on its Axon Trust Center webpage is actionable under the Lanham Act because the content presented on the Trust Center leads a reasonable consumer to believe the opposite of the undisclosed fact. Specifically, the Axon Trust Center (https://trust.axon.com) is designed to provide consumers—especially law enforcement agencies and municipalities—with assurances about the security, reliability, and integrity of Axon's products. By promoting itself as a transparent and secure provider of technology, Axon creates a false impression that its products, including body-worn cameras, are free from significant security risks, including those posed by third-party components like the Quectel modules.

186.    Marcus Womack, a former Executive Vice President of Technology at Axon, while serving as a key spokesperson for the company's products and cloud services, discussed Axon's commitment to security and public safety in his presentations.[87]    His role positions him as a representative whose statements significantly influence the perceptions of Axon's products by law enforcement agencies and other consumers. In a recent presentation, Womack emphasized Axon's dedication to building trust through secure, reliable technology, leading consumers to believe that Axon's products, including body-worn cameras and cloud services, are free from significant vulnerabilities. However, Womack failed to disclose, and Axon failed to clarify, critical information about the potential security risks posed by Quectel components used in

---

[87]Marcus Womack, Axon: Building a Cloud of Trust for Public Safety (YouTube, published 2017), https://youtu.be/_AC5DFi53-k.

Axon's products. This material omission is actionable under the Lanham Act, as Womack's advertisement video on YouTube creates a false impression of security and misled consumers into believing the opposite of the undisclosed fact about risks of Quectel modules in Axon Body 4 devices.

187. The omission is material because it is likely to influence purchasing decisions, especially for law enforcement agencies that rely on the security of their equipment to protect sensitive data. By omitting key information about the risks of Quectel modules in Axon devices, Womack's statements constitute false and misleading advertising under the Lanham Act  because it leads a reasonable consumer to believe the opposite of the undisclosed fact.

188. GovGPT seeks compensatory damages for lost profits, harm to reputation, and diminished market share. Injunctive relief is also requested, requiring Axon to disclose the risks posed by Quectel modules and allowing law enforcement agencies to return or replace affected products.

189. These false and misleading statements and omissions are material in that they are likely to influence purchasing decisions. Law enforcement agencies and municipalities rely on the accuracy of Axon's representations when selecting body-worn cameras and digital evidence management systems for their officers.

190. As a direct and proximate result of Axon's false advertising and deceptive practices, GovGPT has suffered and will continue to suffer commercial injury.

191. Axon's conduct constitutes false advertising and unfair competition in

violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**SECOND CLAIM FOR RELIEF**
VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18
*(Against Axon and Safariland by Plaintiff GovGPT)*

192. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein. Axon's acquisition of VieVu was a stock acquisition within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

193. Axon's acquisition of VieVu from Safariland eliminated one of Axon's potential competitors.

194. The effect of this acquisition has been to substantially lessen competition and to tend to create a monopoly in the Markets in the United States, in violation of Section 7 of the Clayton Act.

195. The relevant market is a cluster market encompassing interrelated products and services used by law enforcement agencies in the United States, including:

    a. **Body-Worn Cameras (BWCs):** Body worn devices for recording interactions between law enforcement and the public.

    b. **Digital Evidence Management Systems:** Platforms that help law enforcement agencies manage, analyze, comprehend, and store digital evidence, ensuring efficient and secure handling of data collected from body-worn cameras and other devices, including with artificial intelligence.

    c. **Public Safety Video Integration and Management Platforms:** Systems that integrate live video feeds from multiple sources (public, private, and

third-party cameras) into a centralized platform for real-time monitoring, analysis, and response coordination by law enforcement agencies.

196.   These products function as a unified technological ecosystem, serving the same core purpose of enhancing law enforcement operations through integrated evidence collection and situational awareness tools. The geographic market is the United States, focusing on local, state, and federal law enforcement agencies.

197.   The Products are not reasonably interchangeable with any other products in the United States. There is no reasonably interchangeable product that would effectively constrain, or has effectively constrained, Axon from imposing and profitably sustaining a SSNIP.

198.   High barriers to entry and expansion have made it infeasible for a competitor like GovGPT to enter the Markets to compete with Axon and restrain its monopoly power despite dramatic price increases.

199.   Axon controls an estimated 85% of the Body-Worn Cameras (BWCs) market, an estimated 95% of the Digital Evidence Management Systems market, and an estimated 75% of the Public Safety Video Integration and Management Platforms market.

200.   On February 1, 2024, Defendant Axon acquired Fusus, a provider of real-time crime center (RTCC) technology. Fusus specializes in integrating video feeds from a wide variety of public and private sources, including fixed surveillance cameras, drones, and other devices.

201. By acquiring Fusus, Axon has vertically integrated its operations, consolidating control over both the acquisition and management of real-time video data. This integration extends Axon's reach across the entire spectrum of evidence collection and management services.

202. The acquisition significantly enhances Axon's monopoly power, limiting competitors like GovGPT from offering similar, comprehensive services. Axon's ability to bundle its products—such as Axon Body 4 cameras, digital evidence management, and real-time video integration—creates cost efficiencies and integrated solutions that smaller or specialized competitors cannot match.

203. Axon's products are designed to work exclusively with its proprietary platform, Evidence.com. This exclusivity prevents competitors like GovGPT from offering interoperable solutions, effectively foreclosing them from the market.

204. Axon's agreements with law enforcement agencies often include exclusivity clauses that tie the purchase of body-worn cameras to the mandatory use of Evidence.com. For instance, in August 2024, Axon entered into a five-year contract with Wilmington, North Carolina, bundling real time streaming from dashcams, mandatory evidence management, and Fusus in a five year agreement with Axon. These contracts create significant switching costs for agencies, discouraging them from considering alternative solutions.

205. The effect of Axon's acquisition of Fusus, combined with its anticompetitive practices, is a substantial lessening of competition in the relevant market for evidence

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

collection and management services. This conduct violates Section 7 of the Clayton Act, which prohibits acquisitions where the effect "may be substantially to lessen competition, or to tend to create a monopoly."

206. As a direct result of Axon's actions, competitors like GovGPT are at a significant disadvantage, impeding their ability to compete effectively. This diminishes innovation, reduces consumer choice, and could lead to higher prices for law enforcement agencies seeking evidence management solutions.

207. Axon admits its monopoly power in the relevant markets or about how its acquisition of VieVu and the Non-Competes solidified Axon's monopoly in the Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems markets and led to anticompetitive harms in a antitrust lawsuit currently pending New Jersey District Court (3:23-cv-07182-RK-RLS) by police departments and municipalities.[88]

208. In 2022, Axon Enterprise, Inc. and Microsoft Corporation extended their strategic partnership, granting Microsoft continued exclusive access to the extensive law enforcement data generated by Axon's body-worn cameras. This data, comprising video footage, audio, and metadata, is stored on Microsoft's Azure platform and serves as a critical input for developing AI models. The exclusive nature of this agreement has substantially reduced competition in both the markets for body-worn cameras and digital

---

[88]Axon's Motion to Dismiss, *Township of Howell et. al. vs. Axon Enterprise, Inc. et al*, No. 3:23-cv-7182, filed Aug. 22, 2023, Dkt. 76.

evidence management systems and the AI market.

209. Through the 2022 extension, Microsoft maintained exclusive control over Axon's body camera data, which is vital for training Axon AI models in video analysis, transcription, and other public safety applications. By restricting access to this data, Microsoft ensured that competitors like GovGPT and other AI developers could not access similar datasets to create competing AI products for law enforcement agencies. This exclusive access gave Microsoft a key advantage, because police departments have very high switching costs to migrate training data needed by AI based digital evidence management competitors like GovGPT refine its AI models, including predictive policing algorithms and video analytics tools, further entrenching its dominant market position.

210. The 2022 extension enabled Microsoft to monopolize AI development for law enforcement technologies by providing it with unparalleled access to data that competitors could not obtain. GovGPT and other competing firms seeking to develop innovative AI solutions are significantly disadvantaged because they have significant barriers to convincing law enforcement agencies to go through the burden of porting data for training models to other vendors while potentially making their Axon body cameras unusable for AI inference. Microsoft's exclusive control over this data created barriers to entry in both the cloud AI and law enforcement technology markets, preventing competitors from offering alternative or better solutions to public safety agencies

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

211.    This monopolistic arrangement between Axon and Microsoft has harmed both competitors and law enforcement agencies. Competitors like GovGPT, which offer AI-based public safety solutions, have found it difficult to convince police departments to provide access to the same datasets without losing access to their body cameras.  As a result, competition is eliminated because of Axon and Microsoft's bundled services, often without the opportunity to explore alternatives that might offer better security, performance, or cost-efficiency.

212.    The 2022 extension agreement between Axon and Microsoft violates Section 7 of the Clayton Act (15 U.S.C. § 18) because it substantially lessens competition in both the body-worn camera and digital evidence management markets, as well as the AI sector. The agreement gives Microsoft exclusive control over Axon's law enforcement data, which creates significant barriers for other companies, stifles innovation, and allows both Axon and Microsoft to maintain monopolistic control over key public safety technologies. This reduction in competition harms both the market and consumers, including law enforcement agencies, municipalities, and taxpayers.

213.    From January 5, 2024 and continuing through today, Axon restrained trade by concealing critical information about the security vulnerabilities associated with Quectel modules, and thereby misleading them into buying Axon products without sufficient disclosure.  This conduct mirrors Qualcomm's actions in *Broadcom v. Qualcomm*[89],

---

[89] *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007). In this case, the Third Circuit held that deception in the standard-setting process, where Qualcomm misled

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

where Qualcomm's deception in the standard-setting process was used to maintain monopoly power, particularly:

a. **But for Axon's Deception, Agencies Would Have Chosen Alternative Technologies or Imposed Different Terms:** As Plaintiff is a competitor in the market for body-worn cameras (BWCs) and digital evidence management systems, Plaintiff has been directly harmed by Axon Enterprise, Inc.'s deceptive practices, particularly their concealment of the security risks associated with the Quectel EG065K modules embedded in the Axon Body 4 cameras.

b. **Materiality of the Concealed Information:** The security and integrity of law enforcement technology are paramount concerns for agencies and municipalities. The inclusion of Quectel modules, which are subject to Chinese laws that may compel cooperation with government entities, poses significant risks of unauthorized surveillance and cyberattacks. These modules enable remote firmware updates, creating potential backdoors for exploitation. Such vulnerabilities directly affect the safety and reliability of the products that law enforcement agencies rely upon daily. Given Axon's knowledge, Axon intentionally concealed material information about the security risks of their

---

standard-setting organizations (SDOs) into adopting its patented technology by promising to license on fair, reasonable, and non-discriminatory (FRAND) terms and then reneging on those commitments, could form the basis for antitrust liability under Section 2 of the Sherman Act. The court found that such deceptive conduct could harm competition by restricting market access and raising barriers for competitors.

products.

c. **Agencies' Reliance on Axon's Representations:** Axon has consistently presented itself as a transparent and ethical company, making statements like "We maintain transparency and operate equitably" and "We're Transparent." Law enforcement agencies and municipalities trusted these representations when procuring Axon's products. They reasonably believed that Axon would disclose any significant security vulnerabilities, especially those that could compromise public safety.

d. **Impact of Deception on Agencies' Decisions:** But for Axon's deception, these agencies and organizations might have made different procurement decisions: Agencies could have selected products from Plaintiff or other competitors that do not incorporate risky components like the Quectel modules. Given the critical importance of security, knowledge of the risks would have prompted agencies to consider secure alternatives that offer comparable or superior functionality without the associated vulnerabilities.

e. **Impact of Deception on Agencies' Decisions:** But for Axon's deception, these agencies and organizations might have made different procurement decisions.

f. **Harm to Competition and Plaintiff:** Axon's concealment of the Quectel modules' risks has distorted the competitive landscape. By misleading agencies about the security of their products, Axon unfairly gained market share at the expense of competitors like Plaintiff.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

214.   Here, Axon is using deceptive practices to maintain its dominance in the body-worn camera and digital evidence management markets, making it difficult for competitors to enter the market or for existing customers to switch due to the lack of information about the security vulnerabilities.  This concealment effectively restrains competition by making it harder for competitors like Plaintiff from presenting their secure alternatives in comparison with Axon, thereby limiting the market's ability to enable competitors to provide safe products on full information. *Id.*

215.   Although product markets are generally defined with "reference to interchangeability or cross-elasticity of demand," the law has long held that there is "no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities." *United States v. Grinnell Corp.,* 384 U.S. 563, 572 (1966).

216.   Moreover, while Plaintiff' proposed market is broader than the FTC's,  under *Leh*, "[a] private action that is substantially broader than a prior Government action may still benefit from [Section 5(i)] tolling where the allegations in the private action incorporate the subject matter of the Government action." *WinnDixie Stores*, 2019 WL 130535, at *9 (citation omitted); see also *Univac Dental Co. v. Dentsply Int'l, Inc.*, 702 F. Supp. 2d 465, 483 (M.D. Pa. Mar. 31, 2010) (adopting report and recommendation) (Section 5(i) can apply "even where [the private litigant's] claims are broader than those advanced in the government action").

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

217.   Moreover, the FTC's proposed amicus brief in the *Township of Howell* litigation on June 17, 2024 (Case: 3:23-cv-07182-RK-RLS, ECF 86-2) clarifies that the Plaintiff is not constrained to the market definition proposed by the FTC in its administrative complaint. It argues that eliminating perceived potential competition in broader markets, including Digital Evidence Management Systems, is equally valid. This supports GovGPT's approach of using a broader market definition to show that Axon's anticompetitive conduct affects more than just the specific body-worn camera market initially considered by the FTC.

218.   The FTC's participation as amicus curiae lends significant weight to the arguments against Axon. As an expert agency with a mandate to protect competition, the FTC's support strengthens GovGPT's position by providing authoritative analysis and endorsement of the antitrust concerns raised. This can be particularly persuasive in demonstrating the seriousness of Axon's anticompetitive behavior.

219.   The brief clarifies that the FTC's decision to dismiss its administrative case against Axon was due to procedural delays, not because of a lack of merit in the antitrust claims. This supports GovGPT's argument that the underlying issues remain unresolved and still pose a significant threat to competition and public welfare.

220.   The FTC emphasizes that the merger has harmed police departments and the communities that fund them, which echoes GovGPT's concern about the use of taxpayer money for monopolized and potentially compromised technology. This helps build the case that Axon's practices not only harm competition but also negatively impact the

public interest, particularly in the context of public safety and security.

221. In *Grinnell*, the Supreme Court approved a "cluster" product definition of "central station service" even though this service consisted of at least two different components, burglar alarm service and fire alarm service, that were complements, not substitutes, for each other. *Id*. at 571-72. The Court did so because "it would be unrealistic on this record to break down the market into the various kinds of central station protective services that are available" and "[c]entral station companies recognize that to compete effectively, they must offer all or nearly all types of service[,]" not just the individual components. *Id*. at 572; see also *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 356 (1963) (approving market definition of "cluster of products . . . and services . . . denoted by the term 'commercial banking'"); *Brown Shoe Co. v. United States*, 370 U.S. 294, 327-28 (1962) (approving grouping of men's, women's, and children's shoes where defendant's market shares were similar for each shoe type such that "considered separately or together, the picture of this merger is the same").

222. Consistent with these precedents, courts recognize that cluster markets are appropriate in a variety of circumstances, such as when "many customers prefer the convenience of receiving the defendant's grouping of products," or "economies of joint provision (economies of scope) make distribution of the cluster cheaper per good than distribution of each separately," or simply for administrative convenience "when the competitive conditions are reasonably similar across services" or goods.

223. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 565 (4th and 5th eds. 2018-2023) ("Areeda").[90]  Even Defendants' cited cases recognize as much. E.g., Intel Corp. v. Seven Networks, LLC, 562 F. Supp. 3d 454, 461 (N.D. Cal. 2021) ("Admittedly, there are cases in which courts have held that commercial realities weigh in favor of putting what might appear to be different products or services into a single market.").

224. Product clusters are especially appropriate in cases involving services that "are complex, interrelated, and interdependent." *Marchese*, 2012 WL 78205, at *11 (quoting *In re The Grand Union Co*., 102 F.T.C. 812, 1044 (1983)).

225. Here, Plaintiff properly alleges distinct cluster markets of "complex, interrelated, and interdependent" products and services offered by Axon.  Plaintiff alleges that the main hardware (the body-worn  camera, tasers, dash cams, drones) "operate[s] in conjunction" with other components, such as docks, battery packs, (for BWCs) digital evidence management systems, and taser  cartridges. Plaintiff further

---

[90]See also, e.g., *FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062, at *15 (D.N.J. Aug. 4, 2021) (adopting FTC's market definition of "cluster of inpatient GAC services" offered by hospitals), aff'd, 30 F.4th 160 (3d Cir. 2022); Marchese v. Cablevision Sys. Corp., 2012 WL 78205, at *9-14 (D.N.J. 2012) (sustaining alleged cluster market of bundled "Two Way Services" consisting of four different home entertainment services); *Premier Comp Sols. LLC v. UPMC*, 163 F.Supp.3d 268, 279-80 (W.D. Pa. 2016) (sustaining alleged cluster market of workers compensation "cost containment services" including four components); *FTC v. Staples, Inc*., 190 F. Supp. 3d 100, 117-18, 127 (D.D.C. 2016) (adopting "cluster market of 'consumable office supplies'").

alleges that Axon itself touts the "efficienc[ies]" that come from using the components (including training and warranties) together and recommends—and even requires—the use of other Axon components within the systems.

226.    Additionally, Plaintiff alleges that customers prefer the convenience of purchasing the components of these integrated systems—including the service, warranties, and training that Axon offers for them—together and from the same manufacturer. These are the quintessential hallmarks of a relevant antitrust cluster market.

227.    Plaintiff' claims—both legal and equitable—are timely. Plaintiff' claims were tolled in their entirety less than two years into the four-year statute of limitations by the FTC's investigation of the Acquisition and the Non-Competes. Alternatively, the statute of limitations for Plaintiff' claims that arise from the NonCompetes (which include Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems claims) was tolled until the FTC lawsuit made the terms of the Non-Competes public.

228.    Due to Axon's conduct in violation of Section 7 of the Clayton Act, Plaintiff have been injured and have paid artificially inflated prices for the Products.

229.    Denying tolling to GovGPT would undermine the Clayton Act's goal of encouraging private parties to assist in antitrust enforcement.  Moreover, allowing Axon to escape liability for ongoing anticompetitive effects simply because the initial conduct occurred before GovGPT's formation would be unjust and contrary to antitrust

principles.

230.   Plaintiff is entitled to treble damages and an injunction against Defendants preventing and restraining the violations alleged herein.

### THIRD CLAIM FOR RELIEF
CONSPIRACY TO RESTRAIN TRADE
VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1;
*(Against Axon, Microsoft, and Safariland by Plaintiff GovGPT)*

231.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

232.   In May 2018, Axon months after its agreement with Microsoft, unlawfully gained monopoly power in the defined Markets by acquiring its largest and most vigorous competitor in the Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems markets, VieVu, LLC ("VieVu"), from Safariland (the "Acquisition").

233.   Axon entered into a number of agreements with Safariland and with Microsoft that have reduced competition, output, and innovation and raised prices above competitive levels in the Markets.

234.   Defendants' agreements, combination, or conspiracy constitute a per se violation of Section 1 of the Sherman Act.

235.   Defendants' conduct also violates the rule-of-reason standard of antitrust liability because Defendants' conduct had actual anticompetitive effects with no or insufficient offsetting procompetitive benefits.

236.     Defendants' anticompetitive acts have injured and will continue to injure competition in the Markets.

237.     Defendants' anticompetitive acts affect interstate commerce and injure competition nationwide.

238.     Defendants' conduct has caused Plaintiff to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Defendants do not cease their anticompetitive conduct.

239.     Plaintiff is threatened with future injury to their business and property by Defendants' continuing violation of Section 1 of the Sherman Act.

240.     Plaintiff is entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

241.     Competing firms in the digital evidence or AI markets like GovGPT do not have access to comparable data sets, allowing Axon and Microsoft to consolidate their positions and reduce market competition.

242.     The agreement effectively stifles competition by enabling Axon to offer stable, yet closed access to Evidence.com digital evidence management solutions that smaller competitors like GovGPT cannot access - stifling competition and making it difficult for startups like GovGPT to compete.

243.     Microsoft's unique hosting of Axon data has harmed competition and consumers, reinforcing both its and Axon's dominance in their respective markets.

244.     Axon has entered into agreements with various entities, including Microsoft,

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

Safariland, law enforcement agencies, police fraternal organizations, and other market participants, with the purpose and effect of unreasonably restraining trade and maintaining its monopoly in the markets for body-worn cameras and digital evidence management systems.

245.   These agreements include, but are not limited to, tying arrangements, exclusive dealing contracts, and other exclusionary practices that prevent competition.

246.   Axon and Microsoft's conduct constitutes concerted action among multiple parties to achieve an unlawful objective, which is to restrain trade and maintain its monopoly, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

247.   Axon and Microsoft's agreements and conduct have had substantial anticompetitive effects, including reducing competition for body-worn cameras and digital evidence management systems, and stifling innovation in the market.

248.   As a direct and proximate result of Axon and Microsoft's unlawful conduct, GovGPT has suffered and will continue to suffer injury to its business and property, including lost profits, diminished market share, and reputational harm.

**FOURTH CLAIM FOR RELIEF**
<u>VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 -
MONOPOLIZATION OF THE BODY-WORN CAMERAS (BWCS) AND RELATED
DIGITAL EVIDENCE MANAGEMENT SYSTEMS MARKETS</u>
*(Against Axon by Plaintiff GovGPT)*

249.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

250.   The relevant product and geographic market consists of Body-Worn Cameras

(BWCs) and related Digital Evidence Management Systems sold in the United States.

251. Since the Acquisition, Axon has had monopoly power in the Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems markets.

252. Axon willfully obtained and maintained its monopoly power through the Acquisition and related noncompete agreements.

253. Axon's conduct has had substantial anticompetitive effects. It has raised prices for Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems above competitive levels and otherwise injured competition with no or insufficient offsetting procompetitive benefits.

254. Axon's anticompetitive acts have injured, and will continue to injure, competition in this market.

255. Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

256. Axon's conduct has caused Plaintiff to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Axon does not cease its anticompetitive conduct.

257. Plaintiff is threatened with future injury to their business and property from Axon's continuing violation of Section 2 of the Sherman Act.

258. Plaintiff is entitled to treble damages and an injunction against Axon preventing and restraining the violations alleged herein.

259. Since the Acquisition, Axon has had monopoly power in the relevant market.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

260.    Axon willfully obtained and maintained its monopoly power through the Acquisition and related noncompete agreements.

261.    Axon's conduct has had substantial anticompetitive effects. It has raised prices for body worn cameras above competitive levels and otherwise injured competition with no or insufficient offsetting procompetitive benefits.

262.    Axon's anticompetitive acts have injured, and will continue to injure, competition in this market.

263.    Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

264.    Axon's conduct has caused Plaintiff to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Axon does not cease its anticompetitive conduct.

265.    Plaintiff is threatened with future injury to their business and property from Axon's continuing violation of Section 2 of the Sherman Act. including from January 5, 2024 and continuing through today, Axon's deliberate concealment of the security risks associated with the Quectel modules in its body-worn cameras misled law enforcement agencies and organizations into adopting Axon's technology without full awareness of its potential vulnerabilities. This deception distorted the competitive landscape by foreclosing consideration of alternative, more secure technologies offered by Plaintiff. As a result, Axon's actions have unfairly restricted competition and innovation in the market for body-worn cameras and digital evidence management systems, constituting

anticompetitive behavior that violates the principles established in *Broadcom v. Qualcomm* regarding deceptive conduct that influences the selection of technologies and imposes unfavorable terms on the market.

266. Plaintiff is entitled to treble damages and an injunction against Axon preventing and restraining the violations alleged herein.

**FIFTH CLAIM FOR RELIEF**
VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 -
ATTEMPTED MONOPOLIZATION OF THE PUBLIC SAFETY VIDEO
INTEGRATION AND MANAGEMENT PLATFORMS MARKETS
*(Against Axon by Plaintiff GovGPT)*

267. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

268. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

269. The relevant product and geographic market consists of Public Safety Video Integration And Management Platforms sold in the United States.

270. The acquisition of Fusus by Axon significantly expanded Axon's control over the real-time crime center technology market, integrating over 33,000 cameras in 2,400 locations. This vertical integration gives Axon a substantial market share in real-time video data management, a critical component of evidence collection.

271. Statements by Axon's CEO of Fusus regarding their goal to replicate New York-style surveillance systems across smaller jurisdictions, combined with the

alignment of Fusus' capabilities with Axon's Body 4 category, suggest a deliberate strategy to dominate the market.

272.   Axon's market control and growth potential are evidenced by the increase in TAM by as much  $26 billion indicating Axon's strategic focus on expanding its dominance.

273.   By combining the real-time surveillance capabilities of Fusus with Axon's Body 4 cameras and Evidence.com, Axon creates a "lock-in" effect. This makes it difficult for competitors to offer similar bundled solutions, thereby foreclosing competition from companies like GovGPT.

274.   Axon's ability to provide bundled pricing for comprehensive services, which competitors like GovGPT cannot match due to the lack of integration with Axon's proprietary systems, is a clear demonstration of anticompetitive practices. This allows Axon to undercut competitors on price and functionality.

275.   Axon maintain's exclusive control over integrated solutions because Axon's integrated solution (combining surveillance, real-time crime center capabilities, and evidence management) raises the cost and complexity for other competitors to enter the market. This further establishes Axon's control over the relevant market, making it difficult for new entrants to compete.

276.   The inability of competitors like GovGPT to match the bundled offering and pricing due to Axon's proprietary control over its products and platforms demonstrates a

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

substantial foreclosure of competition. This contributes to the dangerous probability of Axon achieving monopolistic control over the relevant market.

277.   If Axon does not already have monopoly power in the United States for Public Safety Video Integration And Management Platforms, Axon has attempted to monopolize this market. Axon attempted to acquire and maintain that market power through anticompetitive, exclusionary, and predatory conduct, which Axon intended to have the effect of foreclosing competition in the market for Public Safety Video Integration And Management Platforms and reducing eliminating competition of Public Safety Video Integration And Management Platforms.

278.   As described in more detail above, with its purchase of Fusus, Axon attempted to acquire and maintain market power through anticompetitive conduct, including the acquisition of Fusus in 2024 and the tying and bundling agreements entered between Axon and law enforcement departments.

279.   The anticompetitive conduct described here, undertaken by Axon, creates a dangerous probability that Axon will achieve monopoly power in the Public Safety Video Integration And Management Platforms markets.

280.   Axon's conduct constitutes unlawful attempted monopolization in violation of Section 2 of the Sherman Act.

281.   As a direct and proximate result of Axon's continuing attempted violation of Section 2 of the Sherman Act, competition has been eliminated with no or insufficient offsetting procompetitive benefits, causing injury to Plaintiff.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

282.   Axon's anticompetitive acts have injured and will continue to injure competition in this market.

283.   Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

**SIXTH CLAIM FOR RELIEF**
VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 -
CONSPIRACY TO MONOPOLIZE THE BODY-WORN CAMERAS (BWCS) AND
RELATED DIGITAL EVIDENCE MANAGEMENT SYSTEMS MARKET;
*(Against Axon, Microsoft, and Safariland by GovGPT)*

284.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

285.   Defendants entered into and engaged in an agreement to maintain and enhance Axon's monopoly in violation of Section 2 of the Sherman Act (15 U.S.C. § 2) by engaging in exclusionary conduct designed to prevent competition on the merits in the relevant market for Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems.

286.   Specifically, in exchange for Axon's purchasing VieVu and signing the Holster Agreement, Safariland agreed to withdraw from the market for Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems and not to re-enter, thereby securing Axon's ability to achieve monopoly profits by eliminating a competitor well situated to compete on price and innovation.

287.   Overt acts in furtherance of this conspiracy consisted of, inter alia: (a) Axon's data migration to Microsoft's Azure of Digital Evidence Management Systems,

conducted without adequate informed consent from law enforcement agencies commencing on February 2018, (b) the unlawful customer and product market-allocation agreements between Axon and Safariland entered into on May 3, 2018 by which Safariland agreed not to compete in the Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems markets or solicit Axon's customers or employees, (c) the unlawful acquisition of VieVu on May 3, 2018 by which Safariland agreed to withdraw from the Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems markets, and (d) 2022 extension agreement between Microsoft and Axon to monopolize the relevant markets by granting Microsoft exclusive access to Axon's body-worn camera data, which allowed Microsoft to entrench its own dominance in the AI market while reinforcing Axon's monopoly in the Body-Worn Cameras (BWCs) and related Digital Evidence Management Systems markets.

288. Microsoft, through its partnership with Axon Enterprise, Inc., obtained exclusive access to an extensive repository of body camera footage, hosted on its Azure cloud platform. This footage, generated from Axon's body-worn cameras used by law enforcement agencies across the United States, is a critical dataset that competitors like GovGPT are unable to access without a court order or navigating significant legal barriers. By making it difficult for competitors to convince law enforcement agencies to switch away from Evidence.com without losing functionality of body cameras, Axon and Microsoft effectively conspire to limit competition to public safety AI products such as those offered by GovGPT. The data includes vast amounts of body camera generated

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

footage, essential for developing and training AI models specifically designed for law enforcement and public safety applications and customers locked into the Axon/Microsoft platform.

289.   Upon information and belief, this exclusive access to Axon's body camera data, reinforced by the 2022 extension agreement, provided Microsoft with a key input for the development of AI models that other competitors, such as GovGPT, could not obtain and cannot effectively convince law enforcement customers to provide because they would lose functionality on existing investments in Axon Body-Worn Cameras (BWCs), which would fail to function if related Axon Evidence.com Digital Evidence Management Systems were abandoned.

290.   Microsoft's exclusive role as Axon's cloud service provider granted it unfettered access to the body camera footage hosted on Azure. Axon used this data to train and/or leverage for inference for AI, including Draft One. This exclusive access gave Axon an unfair advantage, allowing it to dominate the AI market by convincing cities to leverage datasets exclusively hosted on Azure on behalf of Axon that are largely inaccessible to other AI developers like GovGPT without convincing cities to abandon their investments in Axon body cameras for inference.

291.   The 2022 extension agreement between Microsoft and Axon not only strengthened Axon's monopoly in the body-worn camera and digital evidence management markets, but also facilitated Microsoft's expansion of its own dominance in the cloud AI space. By making it difficult for customers to choose whether to train its AI

models on Axon's body camera data hosted in Azure or through competitors like GovGPT, the agreement effectively raised barriers to entry for companies like GovGPT that sought to develop competing AI solutions for threat detection and public safety applications.

292.   As a result, the collaboration between Microsoft and Axon established a dual monopoly in both the body-worn camera and AI markets, significantly harming competition by restricting the ability of other companies, including GovGPT, to develop and deploy AI-driven technologies.

293.   The actions taken by Microsoft and Axon have caused substantial harm to competition by creating an unfair competitive environment. Competitors, including GovGPT, have been unable to access the same datasets, severely limiting their ability to develop competitive AI products for the public safety sector. This has reduced competition and fewer choices for law enforcement agencies and other public safety entities that rely on AI technology for video analysis and law enforcement applications.

294.   Moreover, consumers, including municipalities, police departments, and public safety organizations, have been harmed by the lack of competition in the AI market. Microsoft's dominance, established through its exclusive use of critical public data, has resulted in reduced innovation and fewer options for law enforcement agencies seeking to adopt AI-powered solutions for public safety.

295.   By holding its exclusive access to Axon's body camera footage, Microsoft has secured an unfair monopoly advantage in the AI market, particularly in areas

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

competitive with GovGPT's real-time threat detection products, where body camera data is essential for AI model development. Axon's use of this data to train AI models like Draft One on behalf of law enforcement customers has harmed competition and consumers, reinforcing both Microsoft's dominance in the AI market and Axon's monopoly in the body-worn camera and digital evidence management markets.

296. Axon holds substantial monopoly power in the market for body-worn cameras, digital evidence management systems, and emerging AI solutions used by law enforcement agencies across the United States.

297. Axon has conspired with various entities, including law enforcement agencies and police fraternal organizations, to engage in practices that unreasonably restrain trade and maintain its monopoly power.

298. Axon and Microsoft's exclusionary conduct includes, but is not limited to, tying arrangements, exclusive dealing contracts, and lavish spending on police fraternal organizations to secure their loyalty and support, thereby ensuring startups and competitors cannot effectively compete with Axon.

299. The purpose and effect of these agreements and conduct are to maintain and enhance Axon's monopoly power by excluding competitors, including GovGPT, from the market, thereby restraining trade and limiting consumer choice.

300. Axon and Microsoft have engaged in tying arrangements that limit competition because law enforcement agencies have no competitive choice in digital evidence management systems besides Evidence.com when selecting Axon body

cameras, thereby foreclosing competition from other providers of digital evidence management systems.

301. Axon and Microsoft's exclusive dealing contracts for video storage with law enforcement agencies further prevent these agencies from purchasing AI solutions from Axon's competitors because all training data is hosted with Microsoft and Axon, further entrenching Axon's monopoly power.

302. As a direct and proximate result of Axon and Microsoft's unlawful conduct, GovGPT has suffered and will continue to suffer injury to its business and property, including lost profits, diminished market share, and reputational harm.

303. Since the Acquisition, Axon has had monopoly power in the relevant market.

304. Defendants engaged in this with the specific intent of eliminating competition on the merits, and thereby reaping and sharing artificially inflated monopoly profits.

305. Defendants' anticompetitive and unlawful conduct proximately caused injury to Plaintiff by consolidating the market to a single company who imposed long term contracts that prevent new entrants from competing.

306. Defendants' anticompetitive acts affect interstate commerce and injure competition nationwide.

307. Defendants' conduct has caused Plaintiff to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Defendants do not cease their anticompetitive conduct.

308. Plaintiff is threatened with future injury to their business and property by

Defendants' continuing violation of Section 2 of the Sherman Act.

309.    Plaintiff is entitled to treble damages and an injunction against Defendants preventing and restraining the violations alleged herein

### **SEVENTH CLAIM FOR RELIEF**
CALIFORNIA UNFAIR COMPETITION
(CAL. BUS. & PROF. CODE § 17200 ET SEQ.)
*(Against Axon by Plaintiff GovGPT)*

310.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

311.    Axon Enterprise, Inc. has engaged in unlawful, unfair, and fraudulent business practices by failing to disclose the material security risks associated with the Quectel EG065K modules in its Axon Body 4 cameras. These modules, embedded in the cameras, pose a potential risk of surveillance or cyber espionage, as Quectel is subject to Chinese laws that may compel cooperation with government entities. Axon's failure to disclose these risks violates California's Unfair Competition Law (UCL), which prohibits any business practice that is unlawful, unfair, or fraudulent.

312.    **Unlawful**: Axon's conduct violates federal laws such as the Lanham Act for false advertising and misrepresentation, and state laws including California's Consumer Legal Remedies Act (CLRA), which prohibits deceptive practices.

313.    **Unfair**: Axon's failure to disclose these material risks reduces competition because it conceals a material fact that Axon Body 4 could be compromised by foreign interference, hurting public safety.

314.   **Fraudulent**: Axon's omission of the Quectel-related security risks from its product descriptions and sales materials was likely to deceive and mislead consumers who reasonably relied on Axon's representations of the security and integrity of its products.

315.   Axon's failure to disclose the presence of Quectel modules and the related risks is a material omission. Law enforcement agencies and other customers would have likely made different purchasing decisions had they been informed of the potential security vulnerabilities. Axon's omission misled consumers into purchasing body-worn cameras that they believed were secure when, in fact, the cameras could be compromised by external actors.

316.   Axon's omission has harmed competitors like GovGPT by giving Axon an unfair competitive advantage. While GovGPT and other competitors might provide more secure alternatives, Axon's deceptive conduct has allowed it to maintain its market dominance in the body-worn camera and digital evidence management space. Additionally, law enforcement agencies and municipalities that purchased these products have been placed at risk of security breaches, leading to reduced competition from companies with safer solutions like GovGPT.

317.   Axon's failure to disclose these security risks not only harms competition but also the broader public who rely on secure law enforcement technologies. This misconduct endangers public institutions and communities, especially in politically sensitive or high-risk environments.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

**REQUEST FOR RELIEF**

318. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

319. Plaintiff GovGPT incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

320. WHEREFORE, Plaintiff GovGPT respectfully requests that the Court enter judgment in its favor against Defendants Axon Enterprise, Inc., Microsoft Corporation, and Safariland, LLC, and grant the following relief:

321. **Injunctive Relief.**

    a. <u>Against Axon Enterprise, Inc.:</u>

        i. An order permanently enjoining Axon from making false or misleading statements in its advertising and promotional materials, including but not limited to claims of transparency, ethical rigor, and unrestricted ability for customers to switch to other systems.

        ii. An order requiring Axon to disclose fully and prominently the presence and associated security risks of the Quectel modules in its Axon Body 4 cameras to all current and prospective customers.

        iii. An order prohibiting Axon from enforcing any agreements, practices, or policies that prevent or restrict customers from using alternative digital evidence management systems with Axon's body-worn cameras and other hardware products.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

iv. An order mandating that Axon ensure interoperability of its hardware products with third-party digital evidence management systems, including those offered by GovGPT.

v. An order mandating that Axon permit its body-worn cameras, including but not limited to the Axon Body 4 cameras, to interoperate fully with third-party Public Safety Video Integration and Management Platforms.

vi. An order prohibiting Axon from using any technological, contractual, or other means to prevent or hinder the integration of its body-worn cameras with alternative Public Safety Video Integration and Management Platforms.

vii. An order requiring Axon to cease and desist from engaging in any further anticompetitive conduct that violates federal and state antitrust laws.

b. Against Microsoft Corporation:

i. An order enjoining Microsoft from entering into or enforcing exclusive agreements with Axon that limit competition in the relevant markets, including exclusive data hosting arrangements.

ii. An order requiring Microsoft to provide fair and non-discriminatory access to cloud services and data storage solutions to competitors in the body-worn camera and digital evidence management markets.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

c. Against Safariland, LLC:

i. An order enjoining Safariland from enforcing any non-compete agreements or engaging in practices that unreasonably restrain trade in the relevant markets.

322. **Mandatory Conduct Remedies.** An order requiring Axon to take affirmative steps to restore competition in the relevant markets, including:

a. Allowing interoperability between Axon's hardware products (including body-worn cameras) and third-party digital evidence management software, enabling competitors like GovGPT to offer compatible solutions.

b. Offering Axon's hardware products separately from its software services, permitting customers to choose their preferred digital evidence management provider without being compelled into bundled agreements.

c. An order enjoining Axon from engaging in any tying, bundling, or exclusive dealing arrangements that condition the purchase or use of Axon's body-worn cameras or other products on the use of Axon's Public Safety Video Integration and Management Platforms, including Fusus.

323. **Corrective Disclosure and Advertising.** An order requiring Axon to:

a. Disclose fully and accurately the presence and potential risks of any Quectel modules that may pose security vulnerabilities in its products.

b. Cease making false or misleading statements regarding its products' security, transparency, and interoperability.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

c. Implement a corrective advertising campaign to inform customers of the previously undisclosed risks and misrepresentations.

324. **Divestiture of Fusus Acquisition.** An order requiring Axon to divest itself of Fusus and any related assets or businesses acquired in connection with the acquisition, in a manner that restores competitive conditions in the Public Safety Video Integration and Management Platforms market.

325. **Mandatory Compliance Program.** An order requiring Axon to implement and maintain an antitrust compliance program designed to prevent future violations of the Sherman Act, including training for its officers, directors, and employees on antitrust laws and regulations.

326. **Monetary Damages.** Awarding Plaintiff GovGPT damages in an amount to be determined at trial, including but not limited to:

a. **Compensatory Damages:** An award of damages in an amount to be determined at trial for the harm suffered by GovGPT due to Defendants' unlawful conduct, including lost profits, diminished market share, and harm to business reputation.

b. **Treble Damages:** Pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and Section 35 of the Lanham Act (15 U.S.C. § 1117), an award of treble damages for Defendants' willful violations of federal antitrust laws and false advertising statutes.

c. **Disgorgement of Profits:** An order requiring Defendants to disgorge all

ill-gotten gains obtained as a result of their unlawful and anticompetitive conduct.

d. **Punitive Damages:** An award of punitive damages against Defendants for their willful, malicious, and fraudulent conduct, in an amount to be determined at trial, to deter such conduct in the future.

327. **Attorneys' Fees and Costs.** An award of reasonable attorneys' fees, expert witness fees, and costs incurred in bringing this action, as permitted by 15 U.S.C. §§ 15(a) and 1117(a), and California Business and Professions Code § 17200 et seq.

328. **Declaratory Relief:** A declaration that Defendants have violated:

a. Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) by engaging in false advertising and unfair competition with respect to Axon.

b. Section 7 of the Clayton Act (15 U.S.C. § 18) by substantially lessening competition through anticompetitive acquisitions and agreements with respect to Axon.

c. Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) by conspiring to restrain trade, monopolizing, attempting to monopolize, and conspiring to monopolize the relevant markets with respect to Axon, Microsoft, and Safariland.

d. Axon has violated Section 2 of the Sherman Act (15 U.S.C. § 2) by attempting to monopolize the Public Safety Video Integration and Management Platforms market through anticompetitive conduct, including

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

the acquisition of Fusus and the use of exclusionary practices.

    e. Axon's acquisition of Fusus and subsequent conduct have substantially lessened competition and harmed both competitors and consumers in the relevant market.

    f. California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.) by engaging in unlawful, unfair, and fraudulent business practices with respect to Axon.

329. **Restitution and Disgorgement:** An order requiring Defendants to make restitution to GovGPT and any other affected parties for all amounts wrongfully obtained through their deceptive and anticompetitive practices.

330. **Pre- and Post-Judgment Interest:** An award of pre-judgment and post-judgment interest on all monetary awards, at the highest legal rate, from the date of injury until the date of payment.

331. **Pre- and Post-Judgment Interest:** Awarding Plaintiff GovGPT pre-judgment and post-judgment interest on all monetary awards, at the highest lawful rate, from the date of injury until paid.

332. **Other Relief:** Such other and further relief as the Court deems just and proper under the circumstances.

Respectfully submitted this date of September 22, 2024.

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

LEGALFORCE RAPC WORLDWIDE P.C.

/s/ Raj Abhyanker

Raj Abhyanker
Attorney for Plaintiff

FIRST AMENDED COMPLAINT
CASE NO.: 2CV-24-01869-PHX-SMB

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Respectfully submitted this date of September 22, 2024


                                   LEGALFORCE RAPC WORLDWIDE P.C.


                                   /s/ Raj Abhyanker

                                   Raj Abhyanker
                                   Attorney for Plaintiff